UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-10777-PBS

AUSTIN SMITH, Petitioner

V.

MICHAEL A. THOMPSON, SUPERINTENDENT,
Respondent

MEMORANDUM OF LAW IN
SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS

Now comes the petitioner, Austin Smith ("Smith"), and hereby submits this memorandum of law in support of his petition for a writ of habeas corpus and immediate release from his incarceration.

I.   PROCEDURAL BACKGROUND

On November 3, 1995, the Middlesex County Grand Jury returned seven indictments against Smith, charging him with two counts of rape of a child, assault and battery by means of a dangerous weapon, three counts of indecent assault and battery on a person under 14, and assault and battery. Smith was tried before a jury in the Middlesex Superior Court (Connolly, J., presiding) beginning July 29, 1997, and on July 31, 1997, Smith was found not guilty on the assault and battery charge, and guilty of the six other charges. On August 1, 1997, Smith was sentenced to concurrent terms of 18 to 20 years on the two rape charges, and to concurrent terms of 9 to 10 years on the other four charges. On August 7, 1997, Smith filed a timely notice of appeal.

On July 27, 1999, Smith filed a motion for new trial with supporting affidavits in the trial court, and on January 14, 2000, the trial court (Connolly, J.) denied the motion. On January 25, 2000, Smith filed a notice of appeal as to the denial of the motion for new trial, and that appeal was consolidated with Smith's direct appeal.

On June 20, 2001, although it acknowledged that Smith's attorney had "repeatedly elicit[ed] corroborative testimony from the victim and other witnesses" (see Respondent's

1

Supplemental Answer, Volume I, Exhibit 11), the Massachusetts Appeals Court upheld Smith's convictions, and affirmed the denial of his motion for new trial.

Smith applied for further appellate review in the Massachusetts Supreme Judicial Court ("SJC"), but on September 7, 2001, the SJC denied further appellate review.

On April 9, 2002, acting pro se, Smith filed a second Motion for New Trial in the Middlesex Superior Court, and on February 20, 2003, that motion was denied (Connolly, J.). On March 11, 2003, Smith filed a timely Notice of Appeal, and on October 19, 2004, the Massachusetts Appeals Court affirmed the denial of Smith's second motion for new trial. Smith then sought further appellate review from the SJC, but on December 23, 2004, the SJC denied Smith's application.

## II.  FACTUAL BACKGROUND[1]

### A. Complainant's Direct Testimony

The complainant, Anna Garcia[2] testified as follows:

Anna was born on December 2, 1988 (Tr. II: 16)[3]. When Anna was five and six years old, she lived with Smith, Smith's son, Aaron (who was two years younger than Anna), and Maureen, who was the mother of Anna and Aaron, in an apartment with two bedrooms, a livingroom, a kitchen and a bathroom (Tr. II: 19-21, 60).

During the time that they lived together, Smith beat Anna with a folded and dampened belt (Tr. II: 21-26). The beatings left marks on Anna's body, including a small scar on her arm, which was present during the trial (Tr. II: 26-27).

---

[1]  This section of the memorandum is a summary of the more detailed Statement of Facts set forth in Smith's Appeals Court brief, which is reproduced in full in Respondent's Supplemental Answer ("Res. Sup. Ans.") I, Exhibit 8, pp. 2-11.

[2]  The complainant's name and her family members' names are pseudonyms.

[3]  References to the trial transcript will be made as follows: Tr. [volume number]: [page number], and to the record appendix as follows: R. [page number].

2

Smith also anally raped Anna with his penis several times during the time they lived together (Tr. II: 28-33).

When Anna was six, Smith orally raped her with his penis two or three times during the day when Miriam was not home, twice "pee[ing] in [Anna's] mouth," after which she ran to the bathroom and spit out yellow matter (Tr. II: 32, 37-38).

Smith threatened to kill Anna's family if she did anything about the beatings or the rapes (Tr. II: 27-28, 35, 39).

During the time they lived together, Smith also hugged Anna from behind, and rubbed her vaginal area with his hand (Tr. II: 35-37).

When Anna was six, she first reported the sexual abuse to Jim Nally, a Department of Social Services ("DSS") employee (Tr. II: 40, 70). She then told Miriam, and when Miriam took her to the doctor, Miriam and then Anna told the doctor about the abuse (Tr. II: 40-41). Anna was then interviewed out of her home (Tr. II: 42-43).

**B. Fresh Complaint Witnesses' Direct Testimony**

Anna's pediatrician, Dr. Rosselot ("Rosselot") testified that on June 19, 1995, she examined Anna, and found no signs of sexual abuse (Tr. II: 114-117). She stated that Anna reported that Smith anally and orally raped her (Tr. II: 127).

James Nally ("Nally"), who was an investigator for DSS during the time relevant to this case, testified as follows:

On June 19, 1995, Nally went to Anna's home to investigate a report of physical abuse (Tr. II: 148-151). Anna told Nally that Smith had beaten her with a belt so often and so severely that it left marks and bruises, but Nally saw no such marks (Tr. II: 159-160). She then reported that Smith rubbed her vaginal area while hugging her from behind, anally raped her during the night, and orally raped her, twice "peeing" in her mouth when Miriam was not home (Tr. II: 163-167). She also reported that Smith had penetrated her vagina with his fingers (Tr. II: 168). Anna was very upset as she made

3

these disclosures, and after calming down, repeated the complaints of anal and oral rape to Miriam (Tr. II: 170).

On June 21, 1995, Anna was interviewed at a DSS office by an interview specialist, while Nally and others observed through a one-way mirror (Tr. II: 173-175). At this interview, Anna stated that Smith "used her mouth as a bathroom twice," and that afterward, she went to the bathroom and spit it out (Tr. II: 179). She also stated that Smith anally raped her after putting Chapstick on his penis (Tr. II: 179).

### C. Testimony Regarding Smith's Statements

Police Officer John Norton testified that Smith admitted that in the past, he had beaten Anna and Aaron with a belt, but that after being informed by a DSS employee that such beatings were illegal, he stopped (Tr. II: 229-230). Smith emphatically denied sexually abusing Anna, stating that 1) he believed that Miriam had coached Anna into the charges as a result of a debt he owed Miriam, 2) if he had sexually abused Anna, he would have "torn her to shreds," and 3) he had a very active sex life with Miriam, and had no need of sex with Anna (Tr. II: 230-232).

### D. Testimony on Cross-Examination

*1. Anna.* On cross-examination, Anna testified that Miriam's mother, Paula Garcia ("Paula") and Miriam's sister, Donna Garcia ("Donna") did not like Smith, and did not want him to live with Miriam.

At one point, Anna testified that during a period of a week and a half in April, 1995, and during a period of two and one half weeks a month later, while Miriam was in the hospital and before Anna made her disclosures to Nally, Anna lived with Donna and told her about Smith's beatings and sexual abuse (Tr. II: 62-67, 69). Anna later changed her testimony, and stated that she made her first disclosure of sexual abuse to Nally, and after that she told the rest of her family (Tr. II: 88-89).

Anna's cross-examination chronicled the following:

4

    -Her out of court statements to Nally about Smith's beatings (Tr. II: 71-73, 78-79, 81-82), anal rapes (Tr. II: 84-85, 89, 105), oral rapes (Tr. II: 95, 106), digital rape and other sexual assault of her vagina (Tr. II: 95-96), sexual assault of Anna's friends (Tr. II: 96), and threats (Tr. II: 89).

    -Her detailed statements to Miriam, Donna and/or Paula[4] as to Smith's beatings (Tr. II: 88), anal rapes (Tr. II: 92-94), and threats (Tr. II: 93).

    -Her detailed statements in the interview at the DSS office regarding the frequency of the attacks (Tr. II: 99), Smith's oral rapes (Tr. II: 100), threats (Tr. II: 100), use of Chapstick (Tr. II: 101), and beatings (Tr. II: 102-105).

    Anna testified on cross-examination that she told Rosselot about what was happening, that Miriam told Rosselot about the abuse,[5] and that Anna told Rosselot about the beatings before she told Nally (Tr. II: 99-100).

    *2. Rosselot.* On cross-examination, Rosselot stated that during her examination of Anna, Anna was with Miriam and another adult relative (Tr. II: 136-137). Although at that time, Anna denied digital penetration, the adult relative stated to Rosselot that there had been digital penetration (Tr. II: 137).[6]

    *3. Nally.* On cross-examination, Nally stated that Donna initiated the process which led to the DSS investigation of physical abuse by Smith (Tr. II: 182-184), and confirmed that the relationship between Smith and Donna, Miriam and Paula was hostile (Tr. II: 197).

    Nally testified to Anna's detailed statements to him regarding: Smith's physical abuse (Tr. II: 198-199, 201-204); sexual assault while hugging Anna from behind (Tr. II:

---

[4] It should be noted that there was no evidence elicited in Anna's direct testimony that she reported any abuse to either Donna or to Paula.

[5] This hearsay was admitted without objection or limitation.

[6] This hearsay was admitted without objection or limitation.

205); anal rapes (Tr. II: 206-207); oral rapes (Tr. II: 206-207); and digital rape (Tr. II: 208).

Nally also testified that Anna stated in her DSS interview that Smith beat her with a belt on her bare bottom (Tr. II: 211), and put Chapstick on his penis (Tr. II: 216).

Nally denied that Anna told him: she went to the bathroom to spit out what Smith had "peed" into her mouth; that Smith threatened to kill her family if she reported the abuse; anything about Chapstick; that Smith rubbed his penis on her lips; or that Smith rubbed his penis between her legs (Tr. II: 207-208, 212, 214-215). He also denied that in the DSS interview, Anna said that Smith rubbed his penis on her lips, or that he put Chapstick directly between her legs (Tr. II: 214, 216).

III. ARGUMENT

A. Standard of Review

The United States Supreme Court, in *Williams v. Taylor*, 529 U. S. 362 (2000), specifically addressed the standard of review applicable in cases, such as the one at bar, involving 28 USC Section 2254 (d)(1). In relevant part, the court held:

> Under Section 2254(d)(1), the writ [of habeas corpus] may issue only if ... the state court ... identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-413.

The Court acknowledged that the term 'unreasonable' was difficult to define, but made clear that in the context of section 2254(d)(1), a habeas court should make an objective inquiry as to whether the state court acted unreasonably. *Id.* at 409-410. In so doing, the Supreme Court specifically rejected the Fourth Circuit's test that a state court decision was an unreasonable application of federal law if such application was made in a manner that "reasonable jurists would all agree is unreasonable." *Id.* at 409-411.

6

**B. The state courts unreasonably applied established Federal law by failing to recognize that Smith received ineffective assistance of trial counsel in violation of his right to due process, guaranteed by the Sixth Amendment to the U.S. Constitution.**

*1. The Supreme Court Rule*

Under the Sixth Amendment to the United States Constitution, criminal defendants are entitled, in connection with their right to due process, to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). The test is whether "counsel's performance was [so] deficient ... as to deprive the defendant of a fair trial." *Strickland, supra* at 687.

*2. The Trial Attorney's Errors*

A. Fresh Complaint Testimony

The Massachusetts rule regarding fresh complaint testimony is as follows: "Under the fresh complaint doctrine, an out-of-court complaint seasonably made by the [alleged] victim after a sexual assault is admissible as part of the prosecution's case-in-chief. ... Evidence of the complaint is admissible only to corroborate the complainant's testimony; it cannot be presented to establish the truth of the complaint itself." *Commonwealth v. Licata*, 412 Mass. 654, 657 (1992) (footnotes omitted). See also *Commonwealth v. Lavalley*, 410 Mass. 641, 643 (1991) and cases cited.

Massachusetts cases warn that judges must be cautious in admitting fresh complaint evidence, instructing the jury on its limited role when it is admitted and again in the final charge, "and should exercise discretion to prevent the needless repetition of details." *Commonwealth v. Peters*, 429 Mass. 22, 27-28 (1999) citing *Licata, supra* at 658-659.

<u>1. Failure to Seek Limiting Instruction on Complainant's Testimony Regarding Her Out-of-Court Statements</u>

In the instant matter, without objection or a request for a limiting instruction, the prosecutor elicited from the complainant the fact that she told Nally, her doctor, and an interviewer that Smith had sexually abused her. Tr. II: 40-43. And on cross-examination,

7

Smith's trial attorney elicited a barrage of evidence from the complainant about her statements to others regarding both the beatings she alleged to have received from Smith (Tr. II: 71-73, 78-79, 81-82, 88, 99-100, 103, 105), and Smith's sexual abuse (Tr. II: 62-67, 84-85, 88-89, 92-94, 95-96, 99, 100, 101, 105, 106).

Because under Massachusetts law, hearsay admitted without objection may be considered by the jury and may be given any probative value it possesses (*Commonwealth v. Keevan*, 400 Mass. 557, 562 (1991)), Smith's trial attorney's failure to request that the judge give an instruction limiting the jury's use of this testimony was such a significant deficiency that Smith was denied a fair trial. See *Commonwealth v. Bailey*, 370 Mass. 388, 391 ("Ordinarily an out-of-court statement that is merely repetitive of a[n alleged] victim's trial testimony is not admissible as part of the case-in-chief."). See also *Commonwealth v. Peters*, supra at 28 ("We can find no decision, or other authority, which permits a complainant to engage in self-corroboration.")

The complainant testified repeatedly and specifically that she told others about the abuse, and the jury was left to use that evidence as **substantive** proof that the abuse did happen, in direct contravention of the fresh complaint doctrine allowing such evidence as corroboration only. See *Licata*, supra at 657. See also *Commonwealth v. Scullin*, 44 Mass. App. Ct. 9, 11-12 (no tactical reason to fail to object to or to seek limiting instruction as to complainant's testimony of her disclosure of sexual abuse).

Further, the testimony as to the out-of-court allegations of the complainant that Smith beat her were entirely inadmissible, as such statements did not relate to sexual offenses. See *Peters*, supra at 27.

2. Repetitive Testimony

For no reason apparent from the record, Smith's trial attorney, in cross-examination, elicited an avalanche of repeated references to the complainant's out-of-court allegations against Smith. The prosecution's two fresh complaint witnesses (Rosselot and Nally) made a total of twenty statements at trial, detailing the

8

complainant's out-of-court statements to Rosselot, Nally, Miriam and the S.A.I.N. team. See Tr. II: 127, 163-164, 166-167, 168, 170, 179-180.

But on cross-examination, Smith's trial attorney managed to elicit a staggering number of statements as to what the complainant reported. In cross examining the complainant, the following went into evidence:

-four statements regarding the complainant's out-of-court statements to Donna about anal and oral rape (Tr. II: 66-67),

-twenty-three statements regarding the complainant's out-of-court statements to Nally about oral, anal and digital rape, other sexual assaults of the complainant and her friends, and Smith's threats to the complainant (Tr. II: 84-85, 89, 95-96, 105-106),

-fifteen statements regarding the complainant's out-of-court statements to Miriam, Donna and Paula about beatings, sexual abuse, anal rapes, and threats (Tr. II: 88-89, 92-94),

-ten statements regarding the complainant's out-of-court statements to the S.A.I.N. team about the frequency of the alleged attacks, the oral rapes, the threats, the Chapstick and the beatings (Tr. II: 99, 100, 101, 102, 105),

-four statements regarding the complainant's out-of-court statements to Rosselot about the sexual abuse and the beatings (Tr. II: 99-100).

In cross-examining Nally, the following went into evidence:

-twenty two statements regarding the complainant's out-of-court statements to Nally about the beatings, the sexual assaults, and the anal, oral and digital rapes (Tr. II: 198-199, 201-203, 205, 206-207, 209), and

-three statements regarding the complainant's out-of-court statements to the S.A.I.N. team about the Chapstick and the beatings (Tr. II: 211, 216).

*In sum, a staggering **eighty-one statements** were made by witnesses as a result of questioning by Smith's attorney, all alluding to the out-of-court statements made by the complainant about Smith's alleged physical and sexual abuse. By perpetuating the*

9

"needless repetition" of "the particulars of a gruesome crime," Smith's trial attorney created the type of prejudice that is "'self-evident when one party's version of an incident is allowed to be repeated again and again.'" See *Licata, supra* at 659-660, quoting *Cole v. State*, 83 Md. App.. 279, 286 (1990) and *Commonwealth v. Bailey, supra* at 397.

### 3. Fresh Complaint Testimony Not Included in the Commonwealth's Case-in-Chief

Smith's attorney's stupefyingly prejudicial cross-examination elicited from the complainant that in addition to making fresh complaints to Nally, Rosselot and the S.A.I.N. team, she also made such complaints to Miriam, Donna and Paula. Although such testimony was a part of the above-described tidal wave of fresh complaint evidence introduced by Smith's own attorney again him, it was independently objectionable, because under direct examination, the complainant did not testify to *any* fresh complaints made to Miriam, Donna or Paula. See *Peters, supra*. Accordingly, by ineptly handling the cross-examination of the complainant, Smith's attorney not only put into evidence additional support for the Commonwealth's case, but he also "opened the door" for the prosecutor to elicit testimony of the complainant's statements to Miriam, Donna and Paula (Tr. II: 107-108, 170), and to support the Commonwealth's closing by reference to the evidence regarding the complainant's statements to Donna and Paula (Tr. III: 48).

As described above, the damage done by this testimony was not mitigated by any limiting instructions, and as to those statements to Miriam, Donna and Paula regarding the allegations of physical (non-sexual) abuse, such statements were inadmissible regardless of limiting instructions. See *Peters, supra*.

Accordingly, Smith received ineffective assistance of counsel in contravention of his Sixth Amendment rights. See *Peters, supra* at 32 (analysis under *Commonwealth v. Saferian*, 366 Mass. 89 (1974) established that ineffective assistance of counsel included

10

inept cross-examination of complainant which introduced improper fresh complaint evidence, including details that the Commonwealth had not offered).[7]

B. Failure to Introduce Scientific Evidence

Smith's attorney was also ineffective because he failed to introduce scientific evidence in support of Smith's position that the complainant's claims of repeated anal rapes were extremely improbable, which evidence also would have significantly impeached the testimony of the complainant's pediatrician, Rosselot.

In her testimony for the Commonwealth, Rosselot testified that after being informed of allegations of anal rape, she would look for "a crack or a tear, an open bleeding area, or perhaps an abrasion or scraped looking area ... a tiny crack or what we would call a fissure" at the child's anus, but she also stated that any such injury would heal within approximately twenty-four hours. Tr. II: 120-121.

The foregoing testimony left the jury with the impression that even if the complainant suffered a physical injury from anal rape such as an anal fissure, it would have healed within twenty-four hours. This testimony served two critical functions for the Commonwealth. First, it gave a satisfactory explanation for why Rosselot found no physical evidence of anal rape, as her examination took place well over twenty-four hours from the last time Smith was in the presence of the complainant. Second, it satisfactorily explained how a six-year-old girl could be repeatedly anally raped by a full grown man over the course of several months, in a small apartment occupied by two other individuals, without ever suffering injuries sufficient to cause any of her family, friends, or school personnel to notice a problem.

Smith's attorney was ineffective for failing to introduce evidence from a learned treatise (see *Commonwealth v. Sneed*, 413 Mass. 387, 394-396 (1992)) that directly

---

[7] For the purpose of habeas corpus analysis, *Strickland* and *Saferian* are functionally equivalent. *Ouber v. Guarino*, 293 F. 3d 19, 32 (1st Cir. 2002).

11

Case 1:05-cv-10777-PBS Document 11 Filed 08/31/2005 Page 12 of 20

contradicted Rosselot's testimony. According to one such source, anal fissures cause "knife-like pain with bowel movements," and in the approximately one-half of patients who heal with conservative treatment for such fissures, such healing takes about a month, not twenty-four hours. The impact of the attorney's omission is manifest. Not only would such evidence have directly cast doubt on Rosselot's overall credibility, it also would have lent significant support to Smith's theory that the allegations of abuse were simply false. If Anna suffered the type of abuse she alleged, one potential result was a condition which caused "knife-like pain" with bowel movements, which condition would take a month to heal. Contrary to the implication of Rosselot's testimony, any such injuries would have been impossible to ignore or overlook. Accordingly, if Smith's attorney had introduced such evidence, the jury would have been warranted in concluding that it was unlikely that the complainant had suffered such injuries.

C. Evidence of the Motivation Leading to the False Charges Against Smith

Smith's attorney was further deficient in failing to call Miriam as a witness, despite Smith's requests that he do so. As described in Smith's affidavit, filed in support of his motion for new trial, Miriam knew that the complainant, despite her accusations of horrendous and despicable acts by Smith, wanted to visit him (R. 45) and also knew that Smith was so hated by Paula and Donna that each of them repeatedly threatened to ensure that he would return to prison (R. 46).

Finally, Miriam knew that the day after Smith received a refund check from the Internal Revenue Service, she initiated proceedings against him for domestic violence allegedly committed two weeks prior to that date, and obtained a restraining order against him. *Id.* After his arrest and release on those charges, Smith accused Miriam of stealing $500 from him while he was incarcerated, and demanded that she return the money. *Id.* When she refused, he retaliated by reporting her to authorities for public assistance fraud. *Id.* Thereafter, Smith was convicted of violating a restraining order, and while incarcerated on that conviction, was accused of the charges in the instant matter. *Id.*

The pattern of animosity between Smith and Miriam and her family was critical evidence for Smith, as it significantly bolstered his contention that Miriam, and/or Donna and Paula manipulated the complainant into fabricating the charges against him. There simply was no reason to exclude the evidence, as restraining orders had already been introduced against Smith. By foregoing the opportunity to show 1) that after the allegations of almost unspeakable brutality committed against the complainant, she wanted to visit Smith, and 2) that shortly after Smith accused Miriam of public assistance fraud, he was accused of the crimes in this matter, Smith's trial attorney was ineffective.

Finally, had the attorney called Miriam to testify, she might have revealed what she told Smith's attorney's private investigator a week after the trial was concluded -- that Anna had told her that she had fabricated the charges against Smith.

Had Miriam so testified, there can be no question that such testimony was material and credible. The only direct evidence against Smith was the complainant's testimony. A statement by the complainant that she had fabricated the allegations against Smith would have been directly material to the core issue of the case. And the evidence was especially credible, as it would have come from the mother of the complainant, an individual not only obviously concerned about the welfare of the complainant, but as described *supra*, an individual who exhibited considerable animosity toward Smith.

Further, the evidence was not cumulative. Although Smith's theory of the case was that the complainant's allegations were false, there was no direct evidence that the complainant actually ever told anyone that she had lied about the charges. Such evidence would have been a powerful addition to Smith's case.

Because the prosecution's version of events was not corroborated by any physical evidence, and because so many inconsistencies exited in the complainant's testimony (see *infra*), the case against Smith was not strong. Therefore, evidence that the complainant, the only source of evidence against the defendant, stated that she had made the entire story up, firmly establishes that had the jury been presented with the evidence at issue,

such evidence would have been a real factor in its deliberations. Indeed, there is a reasonable probability that the evidence would have led to a different result. See *Matthews v. Rakiey, et al.*, 54 F. 3d 908, 916 (1st Cir. 1995).

### D. Smith's Attorney's Other Failures

Smith's attorney was further ineffective for failing to bring to the court's attention information that would have supported his motion to dismiss the indictments. In his motion to dismiss, Smith alleged that during the grand jury proceedings, erroneous information was given by a witness to a grand juror's question regarding whether the complainant had been seen by a doctor. R. 15-17. The court acknowledged[8] that the potentially exculpatory evidence[9] had been improperly withheld, but found that the error was 1) insufficient evidence that the Commonwealth intentionally provided the grand jury with false evidence in order to obtain an indictment, and 2) not significant enough to have made a difference in the grand jury's deliberations. R. 40-41.

What's Smith's attorney failed to bring to the court's attention in his motion to dismiss, however, was information regarding Smith's whereabouts during the period of time during which these acts were alleged to have occurred as described in the indictments (December 2, 1993 through May 31, 1995). Smith's attorney was aware that Smith was incarcerated from before December, 1993, continuously through his release on May 3, 1994. R. 45-55. This information was critical, because in her grand jury testimony, the same witness that gave the inaccurate information regarding whether the complainant went to the doctor, also told the grand jury in response to a question from a grand juror that Smith lived with the complainant in her house. R. 16.

---

[8] A copy of the court's ruling on Smith's motion to dismiss is reproduced at Res. Sup. Ans. I, Exhibit 4.

[9] As described *supra*, the complainant was seen by Rosselot immediately after she made her allegations, and no physical evidence was found to support the allegations.

14

Once again, the prosecutor allowed the grand jury to be misled by the witness's imprecise response. The prosecutor, as a representative of the Commonwealth, should be held to be aware of information undeniably within the control of a closely related arm of the Commonwealth (the Department of Correction). *Cf. Commonwealth v. Donohue*, 396 Mass. 590, 598-599 (1986). Smith's attorney should have supported his contention that the prosecutor presented "shoddy merchandise" to the grand jury with this additional example of the prosecutor's failure to correct testimony he knew or should have know to be misleading. If the court had been aware that the prosecutor's failure to correct the misleading testimony regarding the doctor was not an isolated instance, and had also been aware of this second mishandled request by the grand jury for corroboration of the complainant's story, it might well have reached a different result in ruling on the motion to dismiss.

### 3. *The Unreasonable Application of Federal Law*

Although the Massachusetts Appeals Court acknowledged that "in repeatedly eliciting corroborative testimony from the victim and other witnesses, [Smith's] counsel's performance fell measurably below that of the ordinary, fallible lawyer," it ultimately concluded that counsel's "deficient representation did not 'cast doubt on the validity of the jury's verdicts.'" Res. Sup. Ans. I, Exhibit 11.

The court's analysis and conclusion was unreasonable. First, Smith's attorney did not only elicit "corroborative testimony" from the victim and other witnesses -- because

he did not seek a limiting instruction, he elicited a wealth of direct evidence against his client. *Commonwealth v. Bailey, supra; Commonwealth v. Peters, supra.*

And second, the attorney's multiple miscues gave the Commonwealth a significant degree of help in securing a conviction in a case that was far from iron-clad.

Without the erroneous additions of Smith's attorney, the Commonwealth's case consisted entirely of the complainant's testimony, corroborated only by fresh complaints. There was no physical evidence to support her unlikely claim that a full-grown man, repeatedly physically and sexually abused her (including anally raping her) when she was a five and six year old girl, in a small apartment, performing the sexual abuse in a way that kept the other two individuals living in the four room apartment from knowing.

Smith's theory was that the complainant was fabricating the charges at the suggestion of Miriam and/or Donna and Paula in order to ensure that Smith would be kept away from Miriam and Miriam's children. There was evidence introduced (including restraining orders) that Smith and Miriam were physically abusive toward each other, and that Donna and Paula were hostile toward Smith. Tr. II: 61, 197; III: 5-7. There was also evidence that for a period of several weeks after Smith had left the home, Miriam was in the hospital, and the complainant and her brother lived with Donna and Paula. Tr. II: 62-67, 69. It was after one of these periods that Donna reported physical abuse to DSS, which led to Nally's interview with the complainant.

Further supporting Smith's theory are the following inconsistencies in the Commonwealth's case:

Despite the fact that the Commonwealth had evidence (from the complainant) that Smith beat his son with a belt, it only indicted Smith with respect to the alleged beating of the complainant (Tr. III: 21-22);

-Despite the fact that the Commonwealth had evidence (from the complainant) that Smith sexually assaulted at least two of the complainant's friends (Tr. II: 96), DSS

16

never investigated such charges, and the Commonwealth did not indict nor did it seek to indict Smith on such charges (Tr. III: 22-23);

-Despite allegations from the complainant that the beatings left her bruised, marked, and otherwise scarred, her display at trial of a scar on her arm which she alleged to have received from such a beating, and her testimony that she told Rosselot of the beatings and marks, Rosselot denied the fact that the complainant reported such abuse, and further, there was no evidence that over the nine month period that Smith lived with the complainant, anyone ever saw any scar or any other evidence of physical abuse (Tr. III: 23-27);

-Despite the fact that the complainant testified to repeated anal rapes by Smith, there was no physical evidence of such abuse, and no evidence that anyone ever knew, over the several months that this abuse was alleged to have taken place, that anything was wrong with the complainant (Tr. III: 23-27, 33);

-Despite the fact that the complainant never told Rosselot or Nally about Vaseline, and despite the fact that the complainant correctly identified a tube of Chapstick as Chapstick, a jar of Vaseline was seized by the police from her apartment two days after the complainant made her allegations of sexual abuse, and this jar was later identified by the complainant as the container of "Chapstick" that she referred to during trial (Tr. III: 27-28);

-Despite the fact that the complainant allegedly told Nally that Smith hit her on the bare bottom (which is one of the reasons Nally began to inquire about sexual abuse in the first place), the complainant testified at trial that Smith never pulled down her pants when he hit her -- he only struck her on top of her clothes (Tr. III: 31);

-Despite the fact that the complainant testified to repeated instances of Smith threatening that he would kill her family if she reported the abuse, she never told Nally about any such threats (Tr. III: 32-33);

17

-Despite the fact that the complainant initially testified that the rapes took place in the day, she later contradicted herself and said that they took place at night, when her mother and brother were sleeping (Tr. III: 33);

-Despite the complainant's testimony about the many places the rapes took place, she never told Nally about such places (Tr. III: 34);

-Despite the fact that the complainant allegedly told Nally that Smith had penetrated her vagina with his finger, she denied such penetration in her report to Rosselot, and Smith was never indicted for such penetration (Tr. III: 34-35);

-Despite the fact that the complainant first testified that when Smith hit her with the belt, he did so when they were alone in her bedroom, she later testified that her brother was in the room when it happened, and then she changed her story again to say that her brother and Miriam were in the room when it happened[10] (Tr. III: 35); and finally,

-Despite the fact that the Commonwealth indicted Smith alleging that the crimes at issue took place between December, 1993 and May 31, 1995, by the admission of the Commonwealth's own witness, Smith was only living with the complainant from approximately June, 1994 through March, 1995 (Tr. III: 19-20).

In recognition of the fact that the Commonwealth's case was entirely dependent on the credibility of the complainant, it was manifestly unreasonable for Smith's attorney to handle the fresh complaint evidence such that 1) the out-of-court statements made by the complainant were allowed to be considered as substantive evidence of the crimes, 2) the out-of-court statements were repeated again and again, such that even that testimony which was subjected to a limiting instruction stood a significant risk of being used by the jury as substantive evidence that the crimes were committed, and 3) cross-examination of

---

[10] Indeed, at one point she made the extremely improbable claim that she was anally raped by Smith in the same room as her sleeping brother (Tr. II: 85).

18

the complainant introduced fresh complaint evidence that the Commonwealth hadn't even offered through the complainant's direct testimony.

While analysis under *Strickland* requires that a reviewing court presume that challenged attorney conduct is strategic (466 U.S. 668 at 689), it is important to note that even if eliciting repeated recitations of the complainant's out-of-court statements were a trial strategy, such strategy was manifestly unreasonable. See *Commonwealth v. Adams*, 374 Mass. 722, 728-729 (1978). If Smith's attorney's intention was to use such statements to convince the jury that the complainant's version of events was not true beyond a reasonable doubt, his effort at establishing those few inconsistencies[11] that did require evidence of the out-of-court statements was catastrophically overinclusive.

For example, to impeach the complainant's trial testimony regarding her allegations of threats by Smith, all Smith's attorney had to do was to ask the complainant whether she told Nally about the threats, and then ask Nally whether the complainant ever reported that Smith threatened her or her family. Instead, the attorney hammered home *all* of the complainant's fresh complaints to Nally both in his cross-examination of the complainant (Tr. II: 83-85) as well as Nally (Tr. II: 204-207), before finally asking Nally whether the complainant reported Smith's alleged threats (Tr. II: 208).

In sum, rather than point only to those out-of-court statements made by the complainant which bolstered Smith's theory of the case, the trial attorney managed to point to all of the statements, repeatedly, occasionally without limiting instruction, offering substantive and corroborative evidence against his own client.

The multiple errors Smith's attorney made in connection with the fresh complaint evidence, when viewed in conjunction with his failure to use evidence available to him to support Smith's theory that the complainant was coached by Miriam, Donna and/or Paula

---

[11] The majority of the inconsistencies relied on by the defense did not concern out-of-court statements by the complainant.

19

because of the bad blood between Smith and Miriam's family, his failure to introduce available scientific evidence to undercut a significant aspect of the Commonwealth's case, his failure to adequately support his motion to dismiss the indictments, and his failure to object to flawed juror instructions all establish that not only did Smith's attorney's representation fall below that of the ordinary, fallible lawyer, it also was so deficient that it was reasonably likely that the jury's decision would have been different absent his flawed representation. *Strickland v. Washington, supra.*

It was unreasonable for the Massachusetts Courts to hold otherwise, and accordingly, Smith is entitled to habeas corpus relief.

## IV. CONCLUSION

For the foregoing reasons, Smith respectfully requests that this honorable court allow his petition for writ of habeas corpus.

Respectfully submitted,
Austin Smith
by his attorney:

_____
Edward B. Gaffney BBO #563719
P.O. Box 5092
Wayland, MA  01778
(781) 894-6668

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on Maura D. McLaughlin, Assistant Attorney General, Criminal Bureau, One Ashburton Place, Boston, MA  02108, by first class mail, postage prepaid, on August 30, 2005.

_____
Edward B. Gaffney, Esq.  BBO #563719
P.O. Box 5092
Wayland, MA  01778
(781) 894-6668