UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------x

AUSTIN SMITH,

                                   Civil Action No.  05-10777-PBS

               Petitioner,

vs.

MICHAEL THOMPSON,

               Respondent.
----------------------------------------------x

## RESPONDENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PETITIONER'S PETITION FOR
## WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

## INTRODUCTION

       The respondent hereby submits this memorandum in opposition to the petition for writ of habeas corpus filed by Austin Smith ("the petitioner").  As set forth below, the petition pursuant to 28 U.S.C. § 2254 should be dismissed because it contains a claim which was not exhausted in the state court.  Moreover, the petition should be denied as to that claim which the petitioner did not preserve by raising it in his direct appeal or in his first motion for a new trial, since that claim is precluded from habeas review by the procedural default rule.  Finally, the petition should be denied because the Massachusetts Appeals Court's decision resolving the petitioner's claims against him was neither contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.

## STATEMENT OF THE CASE

**I.**    **Prior Proceedings**

       On November 9, 1995, a Middlesex grand jury returned seven indictments (Nos. 95-

2022-001 through -007), alleging that in Framingham on diverse dates between December 2, 1993, and May 31, 1995, the petitioner (a) raped the victim by putting his penis in her buttocks; (b) raped her by putting his penis in her mouth; (c) assaulted and battered her with a belt; (d) indecently assaulted and battered her by putting his hand on her vagina; (e) indecently assaulted and battered her by touching her mouth with his penis; (f) indecently assaulted and battered her by touching her buttocks with his penis; and (g) assaulted and battered her. *See* Docket Sheet for *Commonwealth v. Austin Smith*, Middlesex County Superior Court Criminal Action No. 1995-02022, Supplemental Answer ("Supp. Ans."), filed previously, Vol. I, p. 11; *see also* Trial Transcript for  Middlesex County Superior Court Criminal Action No. 1995-02022, Volume I (hereinafter, "Tr./___"), pp. 196-203.

On August 15, 1996, the petitioner moved to dismiss the indictments based on an alleged impropriety in the grand jury proceedings. *See* Supp. Ans., Vol. I, Ex. 1, p. 5; *see also* Supp. Ans., Exs. 2-3.  A hearing on the motion to dismiss was held by Justice Raymond J. Brassard on October 1, 1996, and Justice Brassard issued a memorandum of decision denying the motion on October 3, 1996. Supp. Ans., Vol. I, Ex. 1, p. 6; Supp. Ans., Vol. I, Ex. 4.

On July 29, 1997, trial commenced before Justice Thomas E. Connolly and a jury. Supp. Ans., Vol. I, Ex. 1, p. 6; *see also, generally,* Tr./I.  On July 31, 1997, the jury found the petitioner guilty on six of the seven indictments, the exception being Indictment No. 95-2022-007, alleging assault and battery of the victim.  Supp. Ans., Vol. I, Ex. 1, p.7.   The trial judge sentenced the petitioner to concurrent 18-20 year sentences at the Massachusetts Correctional Institute at Cedar Junction ("MCI-Cedar Junction") on Indictments 95-2022-001 and-002, and to 9-10 year sentences at MCI-Cedar Junction on the remaining indictments, to run concurrently

with each other and with the sentences on -001 and -002. *Id.*

On August 7, 1997, the petitioner filed a timely notice of appeal. Supp. Ans., Vol. I, Ex.

1, p.8. The direct appeal was docketed in the Appeals Court on May 4, 1999. *See* Supp. Ans.,

Vol. I, Ex. 10, p. 4.

On July 27, 1999, a few months after the victim died of complications from strep throat,

the petitioner filed a motion for new trial asserting, among other things, that a new trial was

warranted because the victim had recanted to her mother shortly before the trial. Supp. Ans.,

Vol. I, Ex. 5; *see also* Supp. Ans., Vol. I, Ex. 6, p. 3. On January 14, 2000, the trial judge denied

the motion for new trial with the following endorsement:

> After review of all submissions [including all the submissions of the petitioner
> and the entire package of submissions this day (1/14/00) by ADA Lee Hettinger],
> Motion for a New Trial pursuant to Mass. R. Crim. P. 30(b) is <u>DENIED</u> without a
> hearing.

Supp. Ans., Vol. I, Ex. 7. On January 25, 2000, the petitioner filed a timely notice of appeal

regarding the denial of his motion for a new trial. *See* Supp. Ans., Vol. I, Ex. 10, p. 4. The

appeal of the denial of the motion for new trial was docketed in the Appeals Court on February

15, 2000, and subsequently consolidated with the direct appeal. *See id.; see also* Supp. Ans.,

Vol. I, Ex. 8. The petitioner submitted a *pro se Moffett* brief in addition to the brief submitted by

his attorney. Supp. Ans., Vol. I, Ex. 9.

The Appeals Court denied the petitioner's consolidated appeal on June 20, 2001. *See*

*Commonwealth v. Austin Smith*, 51 Mass. App. Ct. 1116 (2001)(table), Supp. Ans., Vol. I, Ex.

11. The petitioner filed an application for leave to obtain further appellate review in the

Massachusetts Supreme Judicial Court ("the SJC") which was denied on September 7, 2001. *See*

Supp. Ans., Vol. I, Ex. 12; *see also Commonwealth v. Austin Smith*, 435 Mass. 1102

3

(2001)(table), Supp. Ans., Vol. I, Ex. 13.

On April 9, 2002, the *pro se* petitioner filed a second motion for new trial. Supp. Ans.,
Vol. II, Ex. 15.  On February 20, 2003, in a written memorandum of decision, Justice Thomas
Connolly (the trial judge) denied the petitioner's motion. *See* Supp. Ans., Vol II, Ex. 17.  On
March 11, 2002, the petitioner filed a timely notice of appeal. *See* Supp. Ans., Vol II, Exs. 18-
20; Supp. Ans., Vol III, Ex. 21.   On October 19, 2004, the Massachusetts Appeals Court denied
the petitioner's appeal. *See Commonwealth v. Austin Smith,* 62 Mass.App.Ct. 1106 (2004)(table),
Supp. Ans., Vol. III, Ex. 22.  The petitioner filed an Application for Leave to Obtain Further
Appellate Review ("ALOFAR") in the SJC on or about November 9, 2004, and the SJC denied
the ALOFAR on December 23, 2004. *See* Supp. Ans., Vol. III, Exs. 23-24.

## II.    The Instant Habeas Petition

The petitioner filed a petition for a writ of habeas corpus April 1, 2005, claiming
ineffective assistance of trial counsel. As grounds for his petition, the petitioner asserts that
counsel was ineffective in handling the victim's fresh complaint testimony in that he (1) failed to
seek a limiting instruction on the victim's testimony regarding her out of court statements; (2)
elicited repetitive testimony; and (3) elicited fresh complaint testimony not included in the
Commonwealth's case-in-chief (collectively, Ground One). *See* Petition, p. 4, ¶ 12; *see also*
Memorandum of Law in Support of Petition for Writ of Habeas Corpus (hereinafter,
"Petitioner's Memorandum"), pp. 7, 8, 10**.**  The petitioner also alleges that counsel was negligent
in failing to introduce scientific evidence which would have allegedly supported the petitioner's
argument that certain of the victim's claims were improbable and in failing to call the victim's
mother as a witness (Grounds Two and Three). *See id.,* pp. 11, 12.  Finally, the petitioner alleges

4

that counsel was ineffective in failing to present certain evidence in support of the motion to dismiss (Ground Four) and in failing to obtain and present evidence, including a videotape, at trial which would have cast significant doubt on the veracity of the charges made against the petitioner by the victim (Ground Five (A)). *See* Petition, p. 4, ¶ 12.

On or about August 30, 2005, the petitioner filed a memorandum of law in support of his habeas petition. In this memorandum, the petitioner set forth the same Grounds One through Four as he had in his petition, but proposed a new Ground Five. As the newly-stated ground for relief, the petitioner alleged that counsel was inefficient in failing to object to certain instructions given to two jurors before the trial (Ground Five (B)).[1] *See* Petitioner's Memorandum, pp. 14-15.

## STATEMENT OF FACTS

A state court's determination of facts is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *Avellar v. DuBois*, 30 F.Supp.2d 76, 79 (D.Mass. 1998); *Otsuki v. DuBois*, 994 F.Supp. 48, 51 & n.3 (D.Mass. 1998); *cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (holding that the presumption of correctness under former habeas statute applied to "factual determinations made by state courts, whether the court be a trial court or appellate court"), 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). A reviewing habeas court reviews the facts "in the light most favorable to the jury's verdict, consistent with

---

[1] The petitioner did not argue the issue of counsel's supposed failure to present evidence (including the videotape) in his memorandum. However, even if he had made such an argument, he could not have prevailed, because the Appeals Court decided that the issue had been waived since it was not presented in the petitioner's first motion for new trial or in the direct appeal, and thus the issue is procedurally defaulted. *See* Argument, Section II, below; *see also Commonwealth v. Austin Smith,* 62 Mass. App. Ct. 1106 (2004)(table), Supp. Ans., Vol. III, Ex. 22 (petitioner cannot show prejudice excusing default since the Appeals Court found that "the [trial and motion] judge reasonably could conclude . . . that the proffered evidence would not have been a real factor in the jury's deliberations.").

record support." *United States v. Gonzalez-Vasquez*, 219 F.3d 37, 40 (1st Cir. 2000). This

deference extends to inferences drawn by the state court from those factual determinations as

well. *See Parke v. Raley*, 506 U.S. 20, 35, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992); *Flores v.*

*Marshall*, 53 F.Supp.2d 509, 514 (D.Mass. 1999). A petitioner seeking to overturn a state

court's factual determination has the burden of rebutting the presumption of correctness by clear

and convincing evidence. 28 U.S.C. § 2254(e)(1).

The facts regarding the crime of which the petitioner was convicted are as follows[2]:

A.    *The Commonwealth's Case*

The victim, Anna Garcia[3], was born on December 2, 1988. (Tr. II/1, 16, 54.) She was

eight years old when she testified at trial. (*Id.*)

While she was five and six years old, Anna lived at 8 Greenview Street, Apartment 15, in

Framingham, Massachusetts with her mother, Miriam Garcia, her younger half-brother, Aaron,

and the petitioner, who was Aaron's father.[4] (Tr. II/16, 19-20, 52, 57, 223-224.) The apartment

at 8 Greenview Street consisted of Anna's mother's bedroom, a second bedroom that Anna

shared with Aaron, one bathroom, a living room, and a kitchen. (Tr. II/21, 58.) A hallway led

from the living room to the two bedrooms and the bathroom. (Tr. II/58.)

---

[2] These facts are drawn from the Brief for the Commonwealth in the appeal entitled
*Commonwealth v. Austin Smith,* Massachusetts Appeals Court No. 1999-P-0766, Supp. Ans.,
Vol. I, Exhibit 10; from the Commonwealth's Memorandum in Opposition to the Defendant's
Motion for a New Trial, Supp. Ans., Vol. I, Ex. 6; and from the Brief for the Commonwealth in
the appeal entitled *Commonwealth v. Austin Smith,* Massachusetts Appeals Court No. 2003-P-
340.

[3] A pseudonym, as is used in the state court proceedings. *See, e.g.,* Supp. Ans., Exhibit
10, p. 5.

[4] "Miriam Garcia" and "Aaron" are pseudonyms.

6

<u>The Beatings</u>

While the petitioner lived at 8 Greenview Street with Anna, he frequently beat her with a silver-buckled belt. (Tr. II/21, 28, 54.)  He kept the belt in her mother's room and retrieved it from there to beat Anna. (Tr. II/21-22.)  At times, he would wet the belt in the bathroom before beating Anna with it. (Tr. II/23.)  As he beat her, he folded it and made sure to strike with the wet part. (Tr. II/24-25.)

The petitioner's beatings were hard enough to scar Anna. (Tr. II/26, 78.)  At the trial, she still possessed a visible scar on her right forearm from one of the petitioner's belt beatings. (Tr. II/26-27.)

The petitioner scared Anna into not telling her mother about the beatings by threatening to kill her entire family if she told on him. (Tr. II/27-28.)

<u>The Rapes and Sexual Assaults</u>

In addition to the beatings, the petitioner also repeatedly raped and sexually molested Anna while he lived with her at 8 Greenview Street.  (Tr. II/28-49.)

The petitioner's frequent attacks followed a pattern.  While Anna's mother was away from home, either at work or on an errand, the sexual attacks usually occurred in the mother's bedroom. (Tr. II/28-30.)  When Anna's mother was home, the petitioner waited until she was asleep and then raped and molested Anna in the hallway outside her mother's bedroom. (Tr. II/29, 33-34.)

The repeated rapes were often by anal penetration. (Tr. II/28-35.)  The petitioner would first take Anna into her mother's bedroom, or prop her up on a chair facing the wall in the hallway, and expose her buttocks by pulling her pants down. (Tr. II/29-30, 33-34.)  Then he

would take a jar of Vaseline from her mother's makeup counter or the bathroom and grease his penis with the lubricant. (Tr. II/28-31.)   He would then rub his lubricated penis on her mouth or up and down her buttocks and finish by penetrating her anus with his penis. (Tr. II/32.)  He finished each rape with a whispered threat that he would kill Anna's family if she told anyone what he had done. (Tr. II/35.)  Despite her anger about what he was doing to her, the petitioner's threats and rough behavior made Anna fear for her safety and compelled her to keep quiet. (Tr. II/35.)

The petitioner also raped Anna orally. (Tr. II/32, 37-39.)  On at least two occasions when her mother was away from home, the petitioner put his penis in Anna's mouth while they were in the hallway outside her mother's bedroom. (Tr. II/37-39.)  He ejaculated into Anna's mouth twice. (Tr. II/38.)   Each time, she had to run into the bathroom to spit his semen out. (*Id.*)  Anna was angered by these rapes as well, but again was afraid to do anything "[b]ecause he threatened to kill my family and I wouldn't want my family to be dead." (Tr. II/39.)

The petitioner also sexually attacked Anna on a number of occasions by putting his arms around her, grabbing her in a "hug" and groping her vagina while squeezing her buttocks against his crotch.  (Tr. II/35-37.)

<u>The Petitioner's Crimes are Revealed</u>

The first person whom Anna told about the petitioner's sexual attacks was James Nally, a Massachusetts Department of Social Services ("DSS") investigator who interviewed Anna on June 19, 1995, in response to a 51-A report from the Framingham Police.[5]  (Tr. II/147, 159-168; *see also* Tr. II.40-42.)  The report was submitted to DSS after Anna's aunt reported that the

---

[5] A "51-A" report is an allegation of child abuse. (Tr. II/147.)

petitioner had beaten Anna and her brother Aaron. (Tr. II/40-41, 107-108, 147-169, 222.)
Minutes after Anna revealed the sexual attacks to Mr. Nally, she told her mother about the
attacks for the first time. (Tr. II/169-170.)

On that same day, Anna also told Dr. Nancy Rosselot, a pediatrician to whom Anna was
brought that day, about the rapes.  (Tr. II/122, 126-127, 129.)  Two days later, on June 21, 1995,
Anna described the petitioner's crimes again in a recorded interview at the Framingham DSS
office. (Tr. II/173, 222-223.)  Anna also told her aunt and grandmother about the petitioner's
crimes at some point after revealing them to Mr. Nally. (Tr. II/107-108.)

The Petitioner's Statements to the Police

On August 14, 1995, Framingham Police Officer John Norton interviewed the petitioner.
(Tr. II/227.)  After advising the petitioner of his *Miranda* rights, Officer Norton informed the
petitioner that when Anna was interviewed in response to a report of physical abuse, she had
revealed that the petitioner had sexually abused her. (Tr. II/228-230.)

The petitioner admitted to Officer Norton that he had physically abused both Anna and
Aaron by hitting them with a belt. (Tr. II/230.)  However, he denied that he ever sexually abused
Anna. (Tr. II/230-231.)  Rather, the petitioner claimed that Anna's mother had coached Anna
into making up the petitioner's sexual attacks because he owed her money. (Tr. II/231.)   The
petitioner also attempted to deflect suspicion by explaining to Officer Norton that since he had
had sex three to five times a day with Anna's mother while he lived with her (and the victim), he
would not have needed sex from Anna. (Tr. II/232.)

B.     *The Petitioner's Case*

The petitioner did not testify or call any witnesses.  (Tr. III/3-4, 7-9.)  The petitioner's

9

theory was that the victim's mother, aunt, and grandmother coached the victim to tell others that he raped and molested the victim because there was bad blood between them and the petitioner. (Tr. I/231-232; Tr. II/61, 188-197; Tr. III/18-19, 25, 29-30, 36-37, 40.)

Defense counsel attempted to support this theory by eliciting and arguing about purported inconsistencies between the victim's testimony about the rapes and sexual assaults and the fresh complaints testified to by James Nally and Dr. Nancy Rosselot, and by arguing that there was no physical evidence on Anna to corroborate her testimony.  (Tr. I/227-229, 231-232; Tr. II/55, 65-67, 84-85, 88-89, 91, 93-101, 103-106, 129-140, 182, 204-210, 212, 214-217; Tr. III/19, 23-28, 30-35, 37-41.)

Defense counsel also elicited testimony that the petitioner did not reside at the 8 Greenview Street apartment for several months in the time period between December 2, 1993, and May 31, 1995, which was the period covered by the indictment.  The petitioner argued that this raised doubt about whether the petitioner was present at 8 Greenview Street to commit the crimes. (Tr. I/228-229; Tr. II/68-69, 81, 93, 185-186; Tr. III/20-21, 26.)

As to the assault and battery charges, the defense was that the petitioner thought he was exercising proper discipline, and that he never struck Anna with a belt after he was instructed by a DSS representative that such punishments were unacceptable. (Tr. II/201, 234-235; Tr. III/20, 29.)

## **ARGUMENT**

### I.    **SINCE THE PETITIONER HAS FAILED TO EXHAUST THE CLAIM ASSERTED IN GROUND FIVE (B) OF HIS PETITION IN STATE COURT THE**

**PETITION MUST BE DISMISSED.**

As is set forth in the Background section, above, the memorandum in support of the petition articulates a claim for relief which was not presented in the petition itself.  This claim for relief, specifically, the claim that counsel was ineffective for failing to object to certain instructions given to two jurors before the trial, was also never presented to the SJC in either of the petitioner's ALOFARs.  *See* Supp. Ans., Vol. I, Ex. 12; Supp. Ans., Vol. III, Ex. 23.   In order to have exhausted his claims, it is not enough that the petitioner had previously stated a claim of ineffective assistance of counsel; the petitioner must have stated both the factual and legal basis of his argument in state court in order to exhaust it. *See Scarpa v. DuBois,* 38 F.3d 1, 6 (1st. Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995).  "The exhaustion requirement is not satisfied if the petitioner presents . . . new factual allegations in federal court that transform his claim or cast it in a significantly different light." *Domaingue v. Butterworth*, *et al.*, 641 F.2d 8, 12 (1st Cir. 1981).

By adding an unexhausted claim to the claims he had exhausted in the SJC, the petitioner has transformed his petition into a "mixed" petition, *i.e.,* one which contains both exhausted and unexhausted claims.  *See Rose v. Lundy*, 455 U.S. 509, 510 (1982).  Such a "mixed" petition is must be dismissed and may not form the basis for habeas relief. *See id.*

In support of this argument the respondent refers to, and incorporates by reference, the arguments made in its memorandum of law in support of its Motion to Dismiss the Petition for Habeas Corpus, filed herewith.

## II.    THE PETITIONER'S CLAIM FOR RELIEF ON GROUND FIVE (A) OF HIS PETITION IS BARRED BY THE DOCTRINE OF PROCEDURAL DEFAULT.

Review of the claim asserted in Ground Five (A) of the habeas petition is precluded by

11

the procedural default rule.[6] *See Brewer v. Marshall*, 119 F.3d 993, 999 (1st Cir. 1997), *cert.*

*denied*, 522 U.S. 1151 (1998). The Appeals Court clearly found that this claim had been waived

by the petitioner's failure to raise it either in his direct appeal or in his first motion for new trial.[7]

*See Commonwealth v. Austin Smith*, 62 Mass. App. Ct. 1106 (2004)(table), Supp. Ans., Vol. III,

Ex. 22. Procedural default is an "adequate and independent state law ground" which is separate

from the constitutional challenge, and thus this decision should not be reviewed by this Court.

*See Brewer*, 119 F.3d at 999.

The Supreme Court has held that in the interests of comity and federalism, a habeas court

should "not review a question of federal law decided by a state court if the decision of that court

rests on a state law ground that is independent of the federal question and adequate to support the

judgment." *Boutwell v. Bissonnette*, 66 F.Supp.2d 243, 245 (D. Mass. 1999), *quoting Coleman*

---

[6] Ground Five (A) is the claim of ineffective assistance arising from counsel's alleged failure to introduce a piece of "newly discovered evidence," namely a videotape. As is noted in the "Background" Section, above, this claim is set forth in the body of the petition, but is not discussed in the petitioner's memorandum of law. In the interests of completeness, the respondent addresses this claim although the petitioner has not briefed it.

[7] The petitioner may argue that the procedural default rule should not apply to his claim because the Appeals Court considered an alternate reason (other than waiver) why the claim could not have succeeded. *See Commonwealth v. Austin Smith*, 62 Mass. App. Ct. 1106(2004)(table), Supp. Ans., Vol. III, Ex. 22. However, the fact that the Appeals Court considered an alternative reason for upholding the motion judge's decision does not provide a "good reason to question whether there is an independent and adequate state ground for the decision." *See Coleman v. Thompson*, 501 U.S. at 729. A "state court need not fear reaching the merits of a claim in an *alternative* holding. By its very definition, the independent and adequate state ground doctrine requires a federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state also relies on federal law . . . In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity." *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)(internal citations omitted).

*v. Thompson*, 501 U.S. 722, 729 (1991). Such independent and adequate state grounds exist where, as here, "the state court declined to hear [the federal claims] because the prisoner failed to meet a state procedural requirement." *Simpson v. Matesanz*, 175 F.3d 200, 206 (1st Cir. 1999), *cert. denied*, 528 U.S. 1082 (2000), *quoting Brewer,* 119 F.3d at 999. *See also Coleman,* 501 U.S. at 729 (noting that the rule of preclusion applied to both substantive and procedural state law rulings)*; Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995)("The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial. Rather, the remedy is limited to the consideration of federal constitutional claims").

"[T]he application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what [the U.S. Supreme Court] could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of [the Supreme Court's] jurisdiction and a means to undermine the State's interest in enforcing its laws." *Coleman*, 501 U.S. at 730.

To overcome this procedural default to permit federal habeas review, the petitioner must demonstrate either (1) cause and prejudice for the default, or (2) that a failure to review the claim will result in a "fundamental miscarriage of justice," *i.e.*, the conviction of an innocent person. *Coleman*, 501 U.S. at 750. In this case, the petitioner cannot demonstrate either. The fact that the petitioner's trial and appellate counsel failed to raise in the first motion for a new trial or in the direct appeal the argument presented in Ground Five (A) of the petition does not establish cause to excuse this procedural default. *See Murray v. Carrier*, 477 U.S. at 486 (counsel's failure

13

to recognize a claim or failure to raise a recognized claim does not constitute "cause"); *Engle v. Isaac*, 456 U.S. at 134 (counsel's alleged unawareness of objection not sufficient to constitute "cause"). The petitioner suggests no other "cause" for failing to raise these claims on his direct appeal.

Furthermore, even if the petitioner could demonstrate "cause" for his default, he cannot demonstrate that he would suffer the genre of prejudice required to excuse that default, namely, that the alleged error "infect[ed] his entire trial with error of constitutional dimensions." *Ortiz v. DuBois*, 19 F.3d 708, 714 (1st Cir. 1994), *cert. denied*, 513 U.S. 1085 (1995), quoting *United States v. Frady*, 456 U.S. 152, 170 (1982). As to the petitioner's claim of ineffective assistance arising from the failure to present certain "newly discovered evidence," the Appeals Court held:

> The [petitioner] argues that a video tape constitutes new discovered evidence of statements of the victim's mother reflecting on the veracity of the victim, who died of complications from strep throat in 1999, two years after the trial. The [petitioner] claims the statements in the videotape would have cast doubt on his conviction. The statements the [petitioner] refers to in the videotape were issued pursued in various ways unsuccessfully at trial or in his direct appeal. Accordingly, the judge in this case did not abuse his discretion in not accepting the videotape as newly discovered evidence. We think the judge reasonably could conclude in these circumstances that the proffered evidence would not have been a real factor in the jury's deliberations. *See Commonwealth v. Grace*, 397 Mass. 303, 306 (1986). *See also* the reasons given in greater detail in the Commonwealth's brief at pages 26 through 28, including the reasons presented concerning problems of admissibility of the videotape evidence.

*See Commonwealth v. Austin Smith*, 62 Mass. App. Ct. at 1106, Supp. Ans., Vol III, Ex. 22. *See also* Supp. Ans., Vol. II, Ex. 19, pp. 26-28 (sections of Commonwealth's brief referred to and relied on by the Appeals Court in its ruling). The Appeals Court's ruling demonstrates that the petitioner can demonstrate no prejudice rising to the level of error "infecting his entire trial with error of constitutional dimensions." *Ortiz v. DuBois,* 19 F.3d at 714.

Finally, the petitioner can make no demonstration to this habeas court that he actually is

innocent. "To establish actual innocence, a 'petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Simpson v. Matesanz,* 175 F.3d at 210, quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)(citations omitted). The Commonwealth produced ample evidence of the petitioner's guilt. As such, this "quite narrow and seldom used" exception to the procedural default doctrine simply does not apply to this case and habeas review of the claim presented in Ground Five (A) is barred by the rule of procedural default. *Simpson,* 175 F.3d at 210.

**III.    THE PETITIONER IS NOT ENTITLED TO HABEAS CORPUS RELIEF WHERE THE APPEALS COURT'S ADJUDICATION OF HIS CLAIMS WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, <u>CLEARLY ESTABLISHED SUPREME COURT LAW.</u>**

**A.    <u>Standard of Review</u>**

Since the instant petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). *See also* 28 U.S.C. § 2254. AEDPA "places a new constraint on the power of a federal habeas court to grant a state petitioner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000)("a federal [habeas] court operates within a closely circumscribed sphere"). As the Supreme Court has reiterated, AEDPA requires a "'highly deferential standard for evaluating state-court rulings' . . . which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 23 (2002)(*per curiam*), *quoting Lindh*, 521 U.S. at 333, n.7. In relevant part, AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

15

of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. §2254(d)(1-2); *see also Tyler v. Cain*, 533 U.S. 656, 660 (2001). In addition, under AEDPA, state court determinations of factual issues "shall be presumed to be correct" unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000).

#### 1.    The "Contrary To" Prong

A state court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. at 405-06. Under either scenario, in order to fall within the "contrary to" clause, the state court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court law. *Id.*

#### 2.    The "Unreasonable Application Of" Prong

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient -- the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93,

96 (1st Cir. 2002), *citing Williams v. Taylor*, 529 U.S. at 411; *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002)(en banc)("'some increment of incorrectness beyond error is required' . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court"), *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).  Where, for instance, the state court reaches a result that is "devoid of record support for its support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied.  *McCambridge*, 303 F.3d at 37, *citing O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998).  *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied* 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied* 534 U.S. 925 (2001).   In order for a federal habeas court to find that the "unreasonableness" prong has been met, the state court's determination of either the law or the facts must be *objectively* unreasonable.  *See Williams v. Taylor,* 529 U.S. at 411; *Williams v. Matesanz*, 230 F.3d at 426-27; *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright-line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Williams v. Taylor*, 529 U.S. at 410 ("[t]he term 'unreasonable' is no doubt difficult to define").  As the Supreme Court has made clear, however, an incorrect state court determination is not necessarily an unreasonable one.  *Id.* ("the most important point is that an unreasonable application of federal law is different from an *incorrect* application of federal law")(emphasis in original).   It is well-settled that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application [or determination] must also be

17

unreasonable." *Id.* at 411. This same standard should be applied to determine whether a state court's decision was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2). *See Torres*, 223 F.3d at 1108 (reasonableness standards under § 2254(d)(1) and (d)(2) are the same).

> **B.** **The Massachusetts Appeals Court's Decision on the Claims Advanced in the Petition Was Neither Contrary To, Nor an Unreasonable Application of, <u>Established Federal Law</u>**

> A.  <u>Federal Law to Be Applied to Petitioner's Ineffective Assistance Claim</u>

In *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1240-41 (2002), the Supreme Court re-affirmed the fundamental premise that the constitutional right to effective assistance of counsel is not protected for its own sake, bur rather to ensure fair trials. The general rule, then, is established by the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984): a Sixth Amendment violation is only established by a showing that, but for the unprofessional errors of counsel, the result of the proceeding would have been different. *Mickens*, 535 U.S. at 1240. *Strickland* mandates that a petitioner advancing a claim of ineffective assistance of trial counsel must make two showings, on each of which the petitioner bears the burden of proof. *Strickland*, 466 U.S. at 687. First, the petitioner must show that counsel's performance was constitutionally "deficient," meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The petitioner's burden is a heavy one. *Lema v. United States,* 987 F.2d 48, 51 (1st Cir. 1993). "The performance standard is not to be applied in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991), *cert.*

18

*denied,* 502 U.S. 1079 (1992).  Moreover, it is well-recognized that the Constitution does not

guarantee "a letter-perfect defense or a successful defense." *Id.*   A court assessing an ineffective

assistance of counsel claim "must determine whether, in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally competent assistance,"

and "must indulge a strong presumption that counsel's conduct fell within the range of

reasonable professional assistance." *Strickland.* at 689-90.

Second, the petitioner must show that counsel's deficient performance resulted in

"prejudice" to the defense of the case, meaning that "counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result was reliable." *Strickland*, 466 U.S. at

687.  To establish prejudice, the petitioner "must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 694.  In making the determination "whether the specified errors resulted in the required

prejudice, a court should presume . . . that the judge or jury acted according to law." *Id.*

Unless the petitioner is able to show both deficient performance and prejudice, "it cannot

be said that the conviction  . . . resulted from a breakdown in the adversary process that renders

the result unreliable." *Strickland*, 466 U.S. at 687.

B.    Federal Law as Applied to the Facts of the Petitioner's Claim

The petitioner asserts that his counsel was ineffective in (1) his handling of fresh

complaint evidence; (2) failing to introduce scientific evidence; (3) failing to call the victim's

mother as a witness; and (4) failing to present certain evidence in support of a motion to dismiss.

The Appeals Court decided that with respect to the handling of fresh complaint witnesses,

counsel's performance was below the standard set forth in *Strickland*, but that there was no

19

prejudice arising from counsel's actions. *Commonwealth v. Austin Smith*, 51 Mass. App.Ct. 1116 (2001)(table), Supp. Ans., Vol. I, Ex. 11.  With respect to the petitioner's other claims, the Appeals Court that counsel's performance was not deficient and that there was no ineffective assistance of counsel at all. *Id.*  Since the petitioner cannot show that the Appeals Court's decision on his ineffective assistance claim was an unreasonable application of established federal court law,[8] his habeas claim should be denied. *See Williams v. Taylor*, 529 U.S. at 410-411.

1.    *Fresh Complaint Evidence*

The petitioner argues that his trial counsel was ineffective with respect to the fresh complaint evidence offered at trial because he (1) failed to seek a limiting instruction on the victim's testimony regarding her out-of-court statements; (2) elicited repetitive testimony about the victim's claims on cross-examination; and (3) bringing out, on cross-examination, fresh complaint testimony which had not been included in the Commonwealth's case-in chief (namely, evidence that the victim told her mother, aunt, and grandmother about the abuse). *See* Petitioner's Memorandum, pp. 7-11; *see also* Tr. II/107-108.  In evaluating the petitioner's ineffective assistance claim pertaining to the fresh complaint evidence, the Massachusetts Appeals Court determined that the actions of defense counsel at trial fell below the standard for counsel articulated in *Strickland*, but that there was no prejudice to the petitioner arising from counsel's action. *Commonwealth v. Austin Smith*, 51 Mass. App.Ct. 1116 (2001)(table), Supp. Ans., Vol. I, Ex. 11.  The petitioner cannot show that the Appeals Court's determination was

---

[8] The petitioner does not and could not argue that the Appeals Court's decision runs contrary to the holding of any Supreme Court case.

unreasonable, because he cannot make a showing of prejudice, since the evidence which was
presented in the Commonwealth's direct examination of the witnesses-- disregarding the
victim's fresh complaint testimony and the witnesses' testimony on cross examination -- was
more than sufficient to convict the petitioner.

On the Commonwealth's direct examination of the victim, the following facts were
elicited: the victim testified that the petitioner beat her with a belt, which he would sometimes
wet before he hit her. Tr. II/21-28.  The victim further testified that her arm bore a scar from the
petitioner's beatings, and she showed that scar to the jury. *Id.*, pp. 26-27.   The victim also
testified, on direct examination, that the petitioner told her that if she ever told anyone about the
beatings, he would kill her mother and her family. *Id.*, p. 28.

On the issue of sexual assaults, the victim testified on direct examination that the
petitioner would put "grease" or "Chapstick" on his penis[9], pull her pants down, rub his penis
"up and down [her] butt," and put his penis inside her "butt."  Tr. II/28-32, 34-35, 43-44, 46-47.
The victim also testified that the petitioner would touch her "private part," "between her legs,"
and that he put his penis in her mouth. Tr. II/35-36, 37-38.  The victim testified that on two
occasions when the petitioner put his penis in her mouth, he ejaculated (the victim said he
"peed") in her mouth, and she had to run to the bathroom to spit it out. *Id.*, p. 38.  The victim
gave details as to where the assaults took place in the apartment, Tr. II/28-30, 33-34, 47-49, and
when the assaults took place. Tr. II/37, 39-40.  The victim testified that she understood the
difference between right and wrong and knew that it was "wrong" or "bad" if she did not tell the

---

[9] The victim identified a tub of Vaseline as the "Chapstick" she had been referring to.
Tr./II, pp. 30-31.

truth.[10]  Tr. II/14-15, 18.

The Commonwealth also called Dr. Nancy Rosselot as a witness in its case.  Tr. II/108 *et seq.*  Dr. Rosselot was a physician who had been the victim's pediatrician since 1994. *Id.*, p. 113. Dr. Rosselot conducted an examination of the victim on June 19, 1995, after a conversation with the victim's family, focusing her examination on the victim's genital and rectal area.  *Id.,* p. 115. Dr. Rosselot did not find anything abnormal as to the victim's genital or rectal area. *Id.,* pp. 116-117.  She explained that there could sometimes be a tear in the rectal area in cases of abuse involving anal penetration, but that such an injury would usually heal in approximately twenty-four hours.  *Id.,* pp.118-121.  She also testified that such an injury might not occur at all if a lubricant was introduced during penetration. *Id.*, pp. 121-122.

Dr. Rosselot also testified, after the jury was given a "fresh complaint" evidence instruction, that the victim had told her that the petitioner "put his private parts in [her] butt and in [her] mouth." Tr. II/127.

The jury also heard, on the Commonwealth's direct examination, from James Nally, a DSS investigator. Tr. II/146 *et seq.*  Mr. Nally was assigned to investigate a report of child abuse involving the victim in June 1995, and on June 19th he visited the victim's home and spoke with the victim.  *Id.*, pp. 147-149, 151-155.  The jury heard, after receiving a limiting instruction on fresh complaint evidence, that during that visit the victim told Mr. Nally that the petitioner beat her with a belt.  *Id.*, pp. 155-160.  The jury also heard that in response to Mr. Nally's follow-up

---

[10] The victim also testified about the circumstances in which she eventually disclosed the abuse to others. Tr./I, p. 40-43.  However, since the petitioner argues that it was improper to admit this testimony without a limiting instruction, this testimony will not be set forth in support of the respondent's argument.

questions, the victim told Mr. Nally that the petitioner put his penis in her "bum" and in her

mouth. *See id.*, pp. 160-166.  The victim told Mr. Nally the circumstances of the abuse and told

him that the petitioner had "told her not to tell." *Id.*, pp. 167-168.  Mr. Nally also testified that

the victim repeated her story when she was interviewed by a sexual abuse investigation network

team. *Id.,* pp. 173-181.

      Mr. Nally testified that the victim was in tears when she first relayed what had happened

to her.  Tr. II/169.  When Mr. Nally brought the victim out to tell her mother what had happened,

the victim "blurted out" her story, was "in hysterics," and "started to cry uncontrollably, more so

than [when] she had started, more so than she was crying when I was just talking to her alone."

Tr. II/170.  The jury also learned that when the victim's mother heard the allegations she

appeared to be "in shock" and "confused," and that her next reaction was to hug and console her

child.  Tr. II/170-171.  From this testimony about the victim's emotional state when making the

accusation and her mother's reaction, the jury could reasonably decide that the victim's story had

not been fabricated.

      The final witness in the case was John Norton, a police officer for the Town of

Framingham. Tr. II/221 *et seq.*  Officer Norton testified that in the course of investigating a

report of alleged child abuse, he visited the victim's mother's house and removed a plastic

container of Vaseline.  *Id.*, pp. 222-227.   Officer Norton also interviewed the petitioner as part

of his investigation. *Id.*, pp. 227-232.  During this interview, and after he had received and

waived his *Miranda* rights, the petitioner told Officer Norton that he had been hitting his

children with a belt, but that he had stopped doing so when the Department of Social Services

informed him that he should no longer do so.  *Id.*   As to the allegations of sexual abuse of the

23

victim, the petitioner stated that the victim was lying; that the victim's mother must have coached the victim into making up the story; and that he had a very active sex life with the victim's mother, so he would not "need" sex from the victim. *Id.*, pp. 230-232.

In light of all of the foregoing testimony, the jury had abundant evidence to support its conclusion, beyond a reasonable doubt, that the petitioner had committed the crimes of which he was convicted. The fresh complaint evidence brought out as a result of defense counsel's cross-examination was, for the most part, simply cumulative of the evidence coming from the Commonwealth's direct examination. The additional evidence to which defense counsel "opened the door" (namely, evidence that the victim told her mother, aunt, and grandmother about the abuse) did not, in light of the evidence elicited on direct examination, "cast doubt on the validity of the jury's verdicts." *Commonwealth v. Austin Smith*, 51 Mass. App. Ct. 1116 (2001)(table), Supp. Ans., Vol. 1, Ex. 11. Accordingly, the petitioner cannot show that the Appeals Court's determination that he did not suffer prejudice as a result of counsel's actions was objectively unreasonable, and cannot prevail on this claim. *See Williams v. Taylor*, 529 U.S. at 410-411.

2.     *The Alleged Failure to Introduce Scientific Evidence*

The petitioner also argues that the failure of trial counsel to introduce "evidence from a learned treatise" regarding anal fissures constituted ineffective assistance of counsel. *See* Petitioner's Memorandum, pp. 11-12. The Appeals Court has examined this argument, and found it to be without merit. *See Commonwealth v. Austin Smith*, 51 Mass. App. Ct. 1116 (2001)(table), Supp. Ans., Vol. I, Ex. 11. Since the petitioner cannot show that the Appeals Court's decision was an unreasonable application of the *Strickland* standard, his claim on this

24

ground must fail. *See Strickland*, 466 U.S. at 687.

The petitioner cannot show that trial counsel failed to meet the performance standard of the first prong of *Strickland* because the actions of trial counsel clearly indicate a careful preparation for cross-examination on the issue of a lack of medical evidence of anal rape. Trial counsel made successful motions for funds for the services of an expert. *See* Docket Sheet, Supp. Ans., Vol. I, Ex. 1, entry for 3/20/97. Moreover, according to the Assistant District Attorney responsible for the trial, on two separate occasions, petitioner's trial counsel continued the trial date in order to have time to consult with experts regarding this testimony. *See* Supp. Ans., Vol. I, Ex. 6, p. 10. In fact, he represented to the Commonwealth that he had consulted with Dr. Marsha Etkin, a gynecologist at the Massachusetts General Hospital. *See id.; see also* Affidavit of Assistant District Attorney Lee Hettinger, attached to and filed in support of Ex. 6, ¶ 7-8. Trial counsel's use of appropriate terminology and language during his cross-examination of Dr. Rosselot supports the understanding that trial counsel consulted an expert and used the information learned through this consultation in the cross-examination. *See* Tr. II/138-140. Accordingly, trial counsel's actions did not fall "measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974); *see also Strickland*, 466 U.S. at 687.

Moreover, even if this Court were to assume that counsel's performance fell below the standard expected of counsel, the petitioner's claim still fails because he cannot show that but for counsel's actions "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The "learned treatise" on which the petitioner apparently relies (the only one which is in

the state court record)[11] is not inconsistent with Dr. Rosselot's testimony. The petitioner argues that trial counsel should have elicited testimony that fissures are accompanied by "knife-like pain" and "usually" heal in "about one month." *See* Attachment to Supp. Ans., Vol. I., Ex. 6. The petitioner suggests that the failure to challenge Dr. Rosselot's testimony that such injuries could heal within twenty-four hours was ineffective assistance of counsel because it deprived the petitioner of a substantial defense. However, the treatise would not have cast doubt on Dr. Rosselot's credibility or served as a substantial challenge to her testimony because the treatise is not definitive regarding the healing process. *See* Attachment to Supp. Ans., Vol. I., Ex. 6. The treatise states that an anal fissure "usually" heals in "about" one month. Surely this language is not so definitive that it would impeach Dr. Rosselot to such an extent that her entire testimony would be discredited.[12] The use of the words "usually" and "about" in describing the healing process suggests that injuries could heal more quickly or more slowly than a month's time. Moreover, even if this information was provided to the jury it would have had no bearing on the lack of injury at the time of the examination. In late April or May 1995, the petitioner no longer had access to the victim. On May 18, 1995, one of the victim's relatives was appointed to be the victim's temporary guardian. *See* Attachment No. 2 to Supp. Ans., Vol. I., Ex. 6 (marked with "SRA 91" at the bottom). Dr. Rosselot examined the victim on June 19, 1995. Tr. II/114. Even if the last incident of anal rape occurred on the final day the petitioner had access to the victim, more than a month would have passed by the time the victim was examined by Dr. Rosselot.

---

[11] The relevant pages of this treatise are attached as an exhibit to Supp. Ans., Vol. I, Ex. 6, marked with pages "SRA 103-104" and "Exhibit A" at the bottom.

[12] It should be noted that Dr. Rosselot also testified that if a lubricant was used during penetration there might be no fissure at all. Tr. II/121-122.

Therefore, even referring to the treatise offered by the petitioner, any anal fissure suffered by the victim would most likely have healed by that time. Accordingly, the petitioner cannot show that the failure to use the cited treatise caused the outcome of his trial to be different, and his claim on this ground must fail.[13] *See Strickland*, 466 U.S. at 694.

   3.    *The Alleged Failure to Call the Victim's Mother as a Witness*

The petitioner argues that it was ineffective assistance of counsel for counsel to fail to call the victim's mother, identified in court documents as "Miriam," as a witness at trial. The petitioner asserts Miriam that Miriam "knew" that the victim wished to visit the petitioner after the claims of abuse had surfaced; that the victim's aunt and grandmother hated the petitioner and had threatened to send him to prison; that there was friction between Miriam and the petitioner arising from financial difficulties. Petitioner's Memorandum, pp. 12-13. The petitioner further asserts that Miriam "might" have testified that the victim told Miriam that she had fabricated the charges against the petitioner.[14] *Id.,* p.13. Trial counsel's failure to call Miriam as a witness did not, however, either constitute behavior that fell below the standard of counsel expressed by the Supreme Court in *Strickland* or cause prejudice to the petitioner. *See Strickland*, 466 U.S. at 687, 694. Since the Appeals Court's decision to that effect is not objectively unreasonable, the petitioner's claim on this basis must fail. *See Williams v. Taylor,* 529 U.S. at 411.

─────────────

[13] The petitioner's argument that his case would have been different because the treatise would have allowed him to argue that the victim's injuries "would have been impossible to ignore or overlook" is similarly flawed, since no witness testified either affirmatively or negatively on the question of whether the victim expressed any pain or discomfort during the time period in which she was being assaulted.

[14] Notably, the record contains no affidavit or other sworn testimony in the record from Miriam as to what she knew or what would have said if called at trial.

27

In making its determination that counsel's decision not to call Miriam did not constitute ineffective assistance, the Appeals Court was apprized that petitioner's trial counsel was well aware of the volatile relationship between Miriam and the petitioner, as evidenced by the numerous restraining orders Miriam had taken out against the petitioner.  *See* Tr. III/5-7, 19. Trial counsel was also aware that Miriam had a history of psychiatric hospitalizations and use of psychotropic drugs, and that if Miriam were subject to cross-examination, the Commonwealth would have had the opportunity to cross-examine her on her own mental state, her use of illegal drugs, the petitioner's use of illegal drugs[15], and the violent and tumultuous relationship between Miriam and the petitioner.  Moreover, the Appeals Court was aware that Miriam had, at varying times, taken inconsistent positions as to whether she credited the victim's allegations to the petitioner.  *See* Commonwealth's Memorandum in Opposition to the Defendant's Motion for a New Trial, Supp. Ans., Vol. I, Ex. 6, p12, and exhibit thereto (marked "SRA 88").  There was, therefore, more than ample evidence from which the Appeals Court could reasonably conclude that the choice not to call Miriam (and, indeed, not to call any witnesses) was a strategic decision made after conferring with the petitioner and which was, in counsel's mind, in the best interests of the petitioner.  *See* Supp. Ans., Vol. I, Ex. 6, pp. 12-13; *see also* Tr. II/143, 241; Tr. III/3-4.

Furthermore, the Appeals Court reasonably rejected the ineffective assistance claim based on the argument that "had the attorney called Miriam to testify, she might have revealed" that the victim had said that she fabricated the charges against the petitioner.  Indeed, in rejecting

---

[15] The evidence before the Appeals Court included a November 1995 letter from Miriam to the petitioner in which she writes, "Cocaine and weed is probably what caused the blood clots. Remember when we would lay in bed together smoking weed & your heart would start racing. . . ." *See* Commonwealth's Memorandum in Opposition to the Defendant's Motion for a New Trial, Supp. Ans., Vol. I, Ex. 6, p.12, and Exhibit B thereto (marked "SRA 100").

the appeal based on this argument, the Appeals court ruled that "the motion judge, who was the

trial judge, was entitled to look skeptically at assertions of a recantation by the victim that were

brought to the court's attention only after the victim had died." *See Commonwealth v. Austin*

*Smith,* 51 Mass. App. Ct. 1116 (2001)(table), Supp. Ans., Vol. I, Ex. 11.  Since the petitioner

cannot meet his burden of showing that the Appeals Court's decision in this regard was

objectively unreasonable, his claim on this basis cannot succeed. *See Williams v. Taylor*, 529

U.S. at 410-411.

4.    *Grand Jury Proceedings*

The petitioner's final claim of ineffective assistance (in his memorandum Section D,

"Smith's Attorney's Other Failures")[16] arises from counsel's claimed failure to challenge, in a

motion to dismiss, information given to the grand jury about whether the petitioner lived with the

victim. *See* Petitioner's Memorandum, pp. 13-14.   However, trial counsel's decision not to move

to dismiss on this basis was not ineffective assistance of counsel, and the Appeals Court's ruling

to that effect was not an unreasonable application of *Strickland*.

During the grand jury proceedings, the grand jurors heard testimony from a number of

witnesses and saw a portion of a videotaped interview of the victim.  *See* Commonwealth's

Memorandum in Opposition to the Defendant's Motion for a New Trial, Supp. Ans., Vol. I, Ex.

6, p.13.  After the conclusion of the testimony and presentation of the videotape of the victim, a

grand juror asked, out of context of any time frame, "He lived in that house, Austin [the

petitioner]?"  *See id.,* and grand jury testimony page appended as an exhibit thereto (marked

---

[16] To the extent that the petition or memorandum set forth any other claims of ineffective
assistance of counsel, these are addressed in Sections I and II, above.

"SRA 118").   The response from the witness was, "Yes.  He was living there.  Yes."  *See id.*

The question and answer are vague at best as to the time frame being discussed.  It is just as

likely that the grand juror simply wanted to know if the petitioner lived with the victim when the

sexual and physical assaults took place.  If that were the interpretation of the question, the

answer is absolutely correct.  Such a vague question and answer cannot rise to the level of

purposely impairing the integrity of the grand jury by purposely and knowingly providing false

information to obtain an indictment.  *See Commonwealth v. Mayfield*, 398 Mass. 615, 621

(1986).   Where there is no legal basis to challenge grand jury testimony (other than that which

had already been challenged in the motion to dismiss), there can be no ground for a claim of

ineffective assistance of counsel.

     5.    *Petitioner's Contention of Prejudice*

     In support of his claim that prejudice did arise from defense counsel's actions, the

petitioner recites a list of claimed "inconsistencies" in the Commonwealth's case. *See*

Petitioner's Brief, pp. 16-18.   However, the petitioner's assertions that there were inconsistencies

which support his theory of the case do nothing to strengthen his ineffective assistance of

counsel claim. *See* Petitioner's Brief, pp. 16-18.

     Petitioner's trial counsel highlighted for the jury many of the inconsistencies which the

petitioner now identifies in his brief.  For example, petitioner's trial counsel pointed to the fact

that the petitioner did not have access to the victim for much of the time frame in which the acts

were alleged to have occurred. Tr. III/20-21; *see also* Petitioner's Brief, p. 18 (making same

argument).   Trial counsel also argued that even though there were allegations that the petitioner

struck his son with a belt and assaulted some of the victim's friends the Commonwealth did not

bring charges against the petitioner for any crimes other than those against "Anna".[17]  Tr. III/21-23; *see also* Petitioner's Brief, pp. 16-17 (making same argument).  Trial counsel further pointed out the discrepancy between the victim's reference to "Chapstick" being used in the assaults and the Vaseline which was ultimately seized from the apartment.  Tr. III/27-28; *see also* Petitioner's Brief, p. 17 (making same argument).  Likewise, petitioner's trial counsel argued that the victim's assertion that the petitioner beat her in a way which left a scar should not have been credited because the petitioner did not speak of this to Dr. Rosselot and there was no evidence that anyone else saw the scar.  Tr. III/30-32; *see also* Petitioner's Brief, p. 17 (making same argument).

In short, the jury was fully aware of the claimed inconsistencies presented by the petitioner here.  Indeed, the fact that the victim's testimony contained inconsistencies was acknowledged by the Commonwealth in its closing. Tr. III/45-46.  The jury simply chose, as it was entitled to do, to find that these claimed inconsistencies did not create reasonable doubt as to the petitioner's guilt in light of the testimony of the victim and the other witnesses.

The Massachusetts Appeals Court reviewed the petitioner's claim regarding the impact of the alleged "inconsistencies," and decided that the petitioner had not met his burden of showing that but for counsel's actions the result of his trial would likely have been different. *See* Supp. Ans., Vol. I, Ex. 11; Supp. Ans., Vol. III, Ex. 22.   The fact that this Court might, if it were reviewing the case for the first time, make a different determination is not sufficient to allow for

---

[17] The fact that the Commonwealth chose not to indict the petitioner for crimes against the victim's brother and/or friends based on victim's statements does not provide reason to question whether jury properly found the petitioner guilty of crimes against victim. *See* Tr. III/42.

habeas relief under AEDPA. *See Williams v. Taylor*, 529 U. S. at 411.  Rather, this Court must

find that the Appeals Court's decision was objectively unreasonable.  *See id.; see also*

*McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002)(en banc)("'some increment of

incorrectness beyond error is required' . . . The increment need not necessarily be great, but it

must be great enough to make the decision unreasonable in the independent and objective

judgment of the federal court").  Since the petitioner has failed to show that the Appeals Court's

decision was unreasonable, the petitioner's claim must fail.

## CONCLUSION

For the foregoing reasons, the respondent requests that this Court deny the petition for a

writ of habeas corpus and dismiss the petitioner's claims in their entirety.

Respectfully submitted,

MICHAEL THOMPSON,

By his attorneys,

THOMAS F. REILLY,
ATTORNEY GENERAL

/s/ Maura D. McLaughlin
Maura D. McLaughlin
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2857
BBO # 634923

Dated: October 3, 2005

## CERTIFICATE OF SERVICE

32

I hereby certify that I have this 3rd day of October, 2005, served a true and accurate copy of the foregoing pleading on counsel for the petitioner, Austin Smith, by depositing a copy in the office repository for collection and delivery by first class mail, postage prepaid, to the petitioner's counsel at the following address: Edward B. Gaffney, Esq., P.O. Box 5092, Wayland, Massachusetts, 01778.

/s/ Maura D. McLaughlin