# United States District Court
# District of Massachusetts

AUSTIN SMITH,
    Petitioner,

    v.                       CIVIL ACTION NO. 05-10777-PBS

MICHAEL THOMPSON,
    Respondent.

## *REPORT AND RECOMMENDATION ON THE MERITS OF THE PETITION FOR WRIT OF HABEAS CORPUS (#1)*

COLLINGS, U.S.M.J.

### *I. Introduction*

Respondent Michael A. Thompson, Superintendent at the Massachusetts Correctional Institution at Shirley, (hereinafter "Respondent" or "Thompson") seeks dismissal of the above-styled petition for writ of habeas corpus filed by petitioner Austin Smith (hereinafter "Petitioner" or "Smith") under 28 U.S.C. §2254. (#14)  As grounds for his petition, Smith alleges violation of his constitutional due process rights consequent to ineffective assistance of counsel

in that his trial attorney: 1) "ineptly handled fresh complaint evidence" (#1 ¶12(A)(1)); 2) "failed to introduce important scientific evidence which would have supported the petitioner's argument that the complainant's claims of repeated anal rapes were extremely improbable" (#1 ¶12(A)(2)); 3) "failed to call the complainant's mother as a witness, where her testimony would have significantly undermined the complainant's credibility" (#1 ¶12(A)(3)); 4) "failed to adequately support (sic) his motion to dismiss the indictments against the petitioner" (#1 ¶12(A)(4)); and 5) "failed to obtain and present evidence at trial (including a videotape) which would have cast doubt on the veracity of the charges made against the petitioner by the complainant" (#1 ¶12(A)(5)).[1] Thompson asserts that Ground Five is in procedural default and that the remaining grounds fail on the merits under section 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §2254(d).

---

[1]
    In his initial Memorandum in Support of Petition (#11 at 15), Smith additionally argued that his trial "attorney was deficient in failing to object to instructions given by the court to two jurors," a ground not set forth within the petition itself. The Respondent sought dismissal of the writ because that claim had not been exhausted. (#12; #13 at 1) Thereafter on October 19, 2005, the Petitioner was granted leave to amend his memorandum to delete that additional claim and the Respondent's Motion to Dismiss (#12) was denied as moot. (*See* Electronic Order entered 10/19/2005). Although Thompson did not file a new motion to dismiss, he did submit a second Memorandum of Law in Opposition to Petitioner's Petition (#14) in which all of the claims of the petition are addressed.

## II. Procedural Background

The procedural facts are undisputed.  In November, 1995, a grand jury for Middlesex County in Massachusetts returned seven indictments, docket numbers 95-2022-001 through -007, against Smith charging that in Framingham on diverse dates from on or about December 2, 1993 through May 31, 1995, he (1) raped the victim by putting his penis in her buttocks; (2) raped the victim by putting his penis in her mouth; (3) assaulted and beat the victim with a belt; (4) indecently assaulted and battered the victim by putting his hand on her vagina; (5) indecently assaulted and battered the victim by touching his penis against her mouth; (6) indecently assaulted and battered the victim by touching his penis against her buttocks; and (7) assaulted and beat the victim. (#7, Supplemental Answer, Vol. I, Exh. 1; TR[2] Vol. I at 196-203) Approximately ten months later on August 15, 1996, the Petitioner filed a motion to dismiss the indictments on the grounds that "the Commonwealth impaired the grand jury's integrity to indict by presenting distorted and prejudicial evidence to the grand jury." (#7, Exh. 2)  The motion was taken under advisement after a hearing on October 1, 1996, and denied two days later

---

[2]

"TR" is used to designate a trial transcript.

on October 3, 1996. (#7, Exh. 2; Exh. 4)

Trial on the seven indictments began on July 29, 1997, before Superior Court Justice Thomas E. Connolly and a jury. (#7, Exh. 1) On July 31, 1997, the jury found Smith guilty on all the indictments except 95-2022-007, assault and battery. (#7, Exh. 1) The following day, August 1, 1997, the trial judge sentenced the Petitioner to concurrent terms of 18-20 years at the Massachusetts Correctional Institute at Cedar Junction (MCI-Cedar Junction) on the two rape charges, and to concurrent terms of 9-10 years on the remaining four charges. (#7, Exh. 1)

Smith filed a timely notice of appeal on August 7, 1997. (#7, Exh. 1) That direct appeal was docketed in the Appeals Court on May 4, 1999. (#7, Exh. 10 at 4)

On July 27, 1999, several months after the victim in Smith's case died,[3] the Petitioner filed a motion for a new trial in the trial court, together with affidavits. (#7, Exh. 5) About six months later on January 14, 2000, the trial judge denied the motion without a hearing. (#7, Exh. 5) A timely notice of appeal of the denial of his motion for a new trial was filed by Smith on January

---

[3] The victim died of complications related to strep throat.

25, 2000 (#7, Exh. 10 at 4), docketed in the Appeals Court on February 15, 2000 (#7, Exh. 10 at 4), and ultimately consolidated with the direct appeal. (#7, Exh. 10 at 4)

On June 20, 2001, the Appeals Court denied the Petitioner's consolidated appeal, upholding his convictions and affirming the denial of his motion for a new trial. (#7, Exh. 11)  Smith's application for further appellate review in the Massachusetts Supreme Judicial Court ("SJC") was denied on September 7, 2001. (#7, Exh. 12)

Acting *pro se*, the Petitioner filed a second motion for a new trial on April 9, 2002 (#8, Supplemental Answer, Vol. II, Exh. 15), which motion was denied by the trial judge on February 20, 2003. (#8, Exh. 17)  Smith filed a timely notice of appeal (#8, Exh. 18-20); the Appeals Court denied the appeal on October 19, 2004. (#9, Supplemental Answer, Vol. III, Exh. 22)  An application for further appellate review by the SJC was filed in November, 2004 and denied on December 23, 2004. (#9, Exh. 23-24)

On or about April 18, 2005, Smith commenced the instant litigation with the filing of the Petition Under 28 U.S.C. §2254 For Writ of Habeas Corpus. (#1)

### III. The Facts

When considering a habeas petition,

> AEDPA provides that ..., "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1). For this purpose, "factual issues" are defined as "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators.'" *Bryson v. Ward,* 187 F.3d 1193, 1211 (10th Cir.1999), quoting *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). *See also Thompson v. Keohane,* 516 U.S. 99, 112-13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (interpreting pre-AEDPA version of habeas statute).

*Coombs v. State of Me.*, 202 F.3d 14, 18 (1 Cir., 2000)(footnote omitted).

Bearing that standard in mind, the facts of the case are as follows.

Anna Garcia[4], the victim in this case, was eight years old at the time she testified at trial, having been born on December 2, 1988. (TR Vol. II at 16, 54) When Anna was five and six years old, she lived with her mother, Miriam Garcia, her half-brother Aaron who was two years her junior, and the Petitioner, who was Aaron's father, in an apartment at 8 Greenview Street in Framingham,

---

[4] This name is a pseudonym used in the state court proceedings. The names of Anna's mother, Miriam Garcia, and half-brother, Aaron, are also pseudonyms.

Massachusetts. (TR Vol. II at 16, 19-20[5], 52, 57, 223-224)  The Framingham apartment had two bedrooms, one for Anna's mother and one shared by Anna and Aaron, a living room, kitchen and one bathroom. (TR Vol. II at 21, 58) There was a hallway from the living room that led to the bedrooms and bathroom. (TR Vol. II at 58)

During the time that Smith lived in the Framingham apartment with Anna, he often beat her with a belt having a silver buckle that he sometimes dampened and folded before striking her. (TR Vol. II at 21-26, 28)  The beatings were hard enough to leave bruises and marks on Anna's body. (TR Vol. II at 26, 78)  At trial she still had a visible scar on her right forearm from one of the beatings inflicted by the Petitioner. (TR Vol. II at 26-27)  Smith had threatened to kill her whole family if Anna told her mother about the beatings. (TR Vol. II at 27-28)

Also while the Petitioner lived with Anna at 8 Greenview Street, he repeatedly raped and sexually molested her. (TR Vol. II at 28-49)  The attacks occurred in Miriam's bedroom if she was out of the house at work or running an errand, or in the hallway outside the bedrooms if Miriam was at home

---

[5]

Both the Petitioner and the Respondent cite to these transcript pages in support of this testimony, but pages 19 and 20 are missing from the transcript filed with the Court.

asleep. (TR Vol. II at 28-30; 33-34)  Smith would take Anna into her mother's bedroom or stand her up on a chair against the wall in the hallway, pull down her pants, apply lubricant to his penis, rub his penis either on her mouth or buttocks and then finally penetrate her anally. (TR Vol. II at 28-35)  On at least two occasions Smith raped Anna orally when her mother was not home, ejaculating in her mouth ("peed into her mouth" according to the victim) after which she would run to the bathroom to spit out his semen. (TR Vol. II at 32; 37-39)  When he was finished raping her, the Petitioner would threaten Anna not to tell what he had done or he would kill her family. (TR Vol. II at 35; 39)

Additionally while Smith and Anna lived in the same apartment in Framingham, the Petitioner would grab her in a hug, squeezing her buttocks against his crotch while touching her between her legs. (TR Vol. II at 35-37)

On June 19, 1995, a Massachusetts Department of Social Services ("DSS") investigator, James Nally, interviewed Anna in response to a 51-A (child abuse and neglect) report filed with the Framingham Police. (TR Vol. II at 147-148) Anna's maternal aunt, Dion Gomes, had alleged that the Petitioner had physically abused both Anna and her brother Aaron. (TR Vol. II at 147-152; 222)  In the course of the interview with James Nally about the beatings, Anna revealed for the first time that Smith had also sexually abused her. (TR Vol. II

8

at 159-169)  After speaking with James Nally and while he was still present, Anna told her mother that she had been sexually abused by the Petitioner. (TR Vol. II at 169-170)  At some point thereafter she also told her aunt and grandmother. (TR Vol. II at 107-108)

Later in the day on June 19, 1995, Miriam took Anna to see a pediatrician, Dr. Nancy Rosselot, and Anna told the doctor about the rapes. (TR Vol. II at 41; 122; 126-127; 129)  Upon examining Anna, Dr. Rosselot found no signs of sexual abuse. (TR Vol. II at 114-117)  On June 21, 1995, Anna was interviewed[6] at the Framingham DSS office by an interview specialist on the Middlesex County sexual abuse investigation network ("S.A.I.N.") team and she again described how Smith had sexually abused her. (TR Vol. II at 173-175; 178-181; 222-223)

Framingham Police Officer John Norton interviewed the Petitioner on August 14, 1995. (TR Vol. II at 227)  Smith was advised of his *Miranda* rights, and Officer Norton then told him about a report of physical abuse of Anna and Aaron, and Anna's subsequent allegations of sexual abuse. (TR Vol. II at 228-230)  While the Petitioner admitted that he hit both of his children with a belt

---

[6]

The interview was audio and video taped. (TR Vol. II at 174)

for disciplinary purposes, he denied that he had ever sexually abused Anna. (TR Vol. II at 230-231)  Smith claimed that Miriam had coached Anna to make up the story in retaliation for that fact that Smith owed Miriam money. (TR Vol. II at 231)  The Petitioner further asserted that he had an active sex life with Miriam and therefore had no need for sex with Anna. (TR Vol. II at 232)

Although Smith did not call any witnesses or take the stand himself at trial, he attempted to elicit testimony regarding his theory of the case, that being that Anna had been coached by her mother, aunt and grandmother to allege rape and molestation due to the bad blood between those three and the Petitioner. (TR Vol. II at 62; 188-197)  On cross-examination and in argument, Petitioner's trial counsel brought out internal inconsistencies in Anna's testimony, inconsistencies between Anna's trial testimony and the fresh complaint evidence from James Nally and Dr. Rosselot, as well as the lack of physical evidence supporting Anna's testimony. (TR Vol. II at 55; 65-67; 83-85; 88-89; 91; 93-101; 129-140; 182; 204-212; 214-217; TR Vol. III at 18-19; 23-28; 30-35; 37-41)  Testimony was elicited regarding the fact that the Petitioner did not live in the Framingham apartment for several months during the time period covered by the indictments in order to cast doubt on whether Smith was physically present to commit the alleged crimes. (TR Vol. II at 68-69; 81; 93;

185-186)

## IV. The Law

The first step in the analysis is to review the pertinent law.

> Federal review of habeas petitions is normally governed by the high level of deference to state court findings set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214. AEDPA allows federal courts to grant habeas relief after a final state adjudication only if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court" or was based on an "unreasonable determination of the facts." 28 U.S.C. §2254(d). However, this standard applies only when the claim being reviewed at the federal level was "adjudicated on the merits in State court proceedings." *Id.*

*Dugas v. Coplan*, 506 F.3d 1, 6-7 (1 Cir., 2007); *Williams v. Taylor*, 529 U.S. 362, 404-405 (2000).

Smith contends that his case falls within the second category of cases, i.e., those involving "an unreasonable application of clearly established federal law."

As the First Circuit has explained, "[t]he 'unreasonable application' component of section 2254(d)(1) comes into play when the state court identifies the correct legal principle, but unreasonably applies that principle to the facts of the prisoner's case." *Ouber v. Guarino*, 293 F.3d 19, 26 (1 Cir.,

2002)(citation omitted).  The habeas court determines whether the state court decision was an unreasonable application of federal law as determined by the Supreme Court. *Mountjoy v. Warden, New Hampshire State Prison*, 245 F.3d 31, 35 (1 Cir., 2001), *cert. denied sub nom.  Mountjoy v. Cunningham*, 535 U.S. 969 (2002).  The inquiry is an objective one, *see McCambridge v. Hall*, 303 F.3d 24, 36 (1 Cir., 2002), insofar as the state court decision "must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) citing *Williams*, 529 U.S. at 409; *Ouber*, 293 F.3d at 26.

An objectively unreasonable application of the relevant jurisprudence differs from an incorrect or erroneous application of such federal law. *Wiggins*, 539 U.S. at 520 citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)(further citation omitted)("state court's decision must have been more than incorrect or erroneous"); *see also Mountjoy*, 245 F.3d at 35 (distinguishing unreasonable application from incorrect application).  As clarified by the First Circuit, "'some increment of incorrectness beyond error is required'", that increment being "great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge*, 303 F.3d at 36 (citation omitted).

Moreover, "[t]he AEDPA also requires that the relevant legal rule be clearly established in a Supreme Court holding, rather than in dictum or in holdings of lower federal courts." *Ouber*, 293 F.3d at 26 (citation omitted).  As regards the issue in the case at bar, "[t]he *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] principles for deciding ineffective assistance of counsel claims are 'clearly established' for purposes of the AEDPA." *Ouber*, 293 F.3d at 26 (citation omitted); *Smiley v. Maloney*, 422 F.3d 17, 20-21 (1 Cir., 2005).

The First Circuit has quite recently had occasion to outline the contours of a habeas claim of ineffective assistance of counsel:

> The Supreme Court has explained that an ineffective assistance of counsel claim requires both deficient performance and prejudice. *Strickland,* 466 U.S. at 687.
>
> To establish that counsel's performance was deficient, a defendant must show that it fell below an objective standard of reasonableness under the circumstances. *Id.* at 687-88. This is a highly deferential review, making every effort to "eliminate the distorting effects of hindsight." *Id.* at 689. As the Supreme Court emphasized in *Yarborough v. Gentry,* the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). When examining counsel's conduct, the court considers the facts of the particular case from counsel's perspective at the time. *Strickland,* 466 U.S.

> at 690. Counsel has "wide latitude in deciding how best to represent a client," *Gentry,* 540 U.S. at 5-6, and benefits from a strong presumption that he or she rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions. *Strickland,* 466 U.S. at 690.

*Sleeper v. Spencer*, - F.3d -, 2007 WL 4248494, at *5 (1 Cir., 12/5/2007); *see also Dugas,* 506 F.3d at 3 ("To succeed with his claim [that he received constitutionally ineffective assistance of counsel], [petitioner] must demonstrate both deficient performance by his attorney and prejudice, i.e., 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984).").

This Court need not dwell on the first prong of the two-part inquiry when reviewing Ground One of the petition in light of the state court's determination that, in fact, trial "counsel's performance fell measurably below that of the ordinary fallible lawyer." (#7, Exh. 11)   However, since both "deficient performance and prejudice" must be established in order to prevail on a claim of ineffective assistance of counsel, *Sleeper*, 2007 WL 4248494, at *5, the issue on Ground One devolves into examining whether the Appeals Court's no prejudice finding was an unreasonable application of *Strickland*.[7]

---

[7]

In assessing the prejudice prong, the state Appeals Court did not cite *Strickland* but rather the state law case of *Commonwealth v. Saferian*, 366 Mass. 89, 315 N.E.2d 878 (1974) which applied a functionally equivalent standard. *See Lynch V. Ficco,* 438 F.3d 35, 48 (1 Cir., 2006) ("In fact, the SJC's standard for ineffective assistance of counsel, articulated in *Commonwealth v. Saferian,* 366 Mass. 89, 315 N.E.2d 878, 883 (1974), is the functional equivalent of the *Strickland* standard."); *Ouber*, 293 F.3d at 32 (discussing

As explained by the First Circuit,

> To establish prejudice, the defendant must show that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *See Wiggins v. Smith,* 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (finding prejudice where there was a "reasonable probability that at least one juror would have struck a different balance"); *Strickland,* 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694.

*Sleeper,* 2007 WL 4248494, *5; *Dugas,* 506 F.3d at 9.

The First Circuit has limned the meaning of a "reasonable probability that the result of the proceeding would have been different" even more finely:

> A showing of "'some conceivable effect on the outcome'" is not enough. *Id.* (quoting *Strickland,* 466 U.S. at 693). However, there is no requirement that "the defendant prove that the errors were more likely than not to have affected the verdict." *Id.* Instead, *Strickland* requires that we focus on the "'fundamental fairness of the proceeding.'" *Id.* (quoting *Strickland,*

---

functional equivalence of Massachusetts and federal standards for habeas purposes); *Scarpa v. DuBois*, 38 F.3d 1, 7-8 (1 Cir., 1994) (noting that state and federal ineffective assistance of counsel standards "strike us as equivalent"), *cert. denied,* 513 U.S. 1129 (1995). Further, although the Appeals Court offered no explanation for its finding of no prejudice, "it is not required to do so. AEDPA requires that a deferential standard of review [apply to] claims 'adjudicated on the merits.' It does not require that the state courts explain their reasoning." *Perkins v. Russo*, 2007 WL 2507741, at *5 (D. Mass., 8/31/2007) (citations omitted). However, it would be very helpful to a court faced with a habeas petition to know the Appeals Court's reasoning as it attempts to assess whether the decision is an "unreasonable application" of federal law.

466 U.S. at 696).

> "In weighing the prejudicial effect of counsel's errors, we must consider the totality of the evidence before the judge or jury." *Stephens v. Hall,* 294 F.3d 210, 218 (1st Cir. 2002). In cases where defense counsel's deficient performance resulted in a failure to introduce particular evidence or to challenge the credibility of the government's witnesses on cross-examination, we have outlined three factors that need to be considered in the prejudice determination: first, the strength of the prosecution's case; second, the effectiveness of the defense that was presented at trial; third, the potential value of the new evidence and new avenues for cross-examination "in undermining the credibility of the government witnesses' testimony." *González-Soberal,* 244 F.3d at 278.

*Dugas,* 506 F.3d at 9.

Determining prejudice "is normally a difficult endeavor." *Ouber,* 293 F.3d at 33. It involves assessing the hypothetical situation of "whether the trial might have ended differently absent the lawyer's blunder." *Ouber,* 293 F.3d at 33. Furthermore, prejudice more often exists in a close case where the record only weakly supports the jury's finding. *See Strickland,* 466 U.S. at 696.

### V. Discussion

### A. Ground One - Fresh Complaint Evidence

16

Apart from the scar on Anna's forearm caused by a beating at the hands of Smith, there was no physical evidence introduced at trial with regard to physical or sexual abuse.  The Commonwealth's case was basically founded on the testimony of an eight year old victim and two fresh complaint witnesses.[8] Defense counsel highlighted internal inconsistencies in Anna's testimony as well as inconsistencies between Anna's testimony and that of the fresh complaint witnesses.[9]  Credibility, particularly that of Anna, was the key.

The Petitioner's position is that his attorney's handling of the fresh complaint testimony was so egregious in three respects that he was denied effective assistance of counsel.  At the time of Smith's trial, the relevant Massachusetts law was as follows:

> "[O]ur fresh complaint doctrine 'permits an out-of-

---

[8]

The testimony of Officer Norton was limited in scope.

[9]

> Some inconsistency between a fresh complaint witness's testimony and a complainant's testimony is expected, and will often aid the jury in determining whether the fresh complaint testimony ultimately supports the complainant's story. To the extent that there were inconsistencies between the testimony of the two adults and the testimony of the child, they were insignificant. The weight and credibility of the witnesses' testimony are solely for the fact finder and are not proper subjects for appeal. Cf. *Commonwealth v. Lydon,* 413 Mass. 309, 311, 597 N.E.2d 36 (1992).

*Commonwealth v. King*, 445 Mass. 217, 235, 834 N.E.2d 1175, 1192 (2005), *cert. denied,* 546 U.S. 1216 (2006).

court complaint seasonably made by the complainant in a sexual assault case to be admitted as part of the prosecution's case-in-chief. Evidence of the fact of the complaint is admissible only to corroborate the complainant's testimony [and not] ... to establish the truth of the complaint itself ... fresh complaint witness may testify both to the fact of the complaint and the details of the complaint as expressed by the complainant'.... 'While a complainant may testify about the fact that she made a complaint to another about a sexual assault, the person complained to, the fresh complaint witness, must be produced to testify about what the complainant said and to be available for cross-examination.' ... Finally, pursuant to our rule, the admissibility of the fact of the complaint is not dependent on an attack on the credibility of the complainant."

*Id.* [*Commonwealth v. Montanez,* 439 Mass. 441] at 445, 788 N.E.2d 954 at 445, 788 N.E.2d 954 [2003], quoting *Commonwealth v. Peters,* 429 Mass. 22, 27, 28, 705 N.E.2d 1118 (1999). Thus, under the doctrine as it has existed previously, a *complainant* was permitted to testify only to the fact that a fresh complaint was made and to whom it was made, *Commonwealth v. Peters, supra* at 30, 705 N.E.2d 1118, while a fresh complaint witness was permitted to testify to details of the complaint, provided those details did not exceed the scope of the complainant's testimony about the incident. See *Commonwealth v. Flebotte,* 417 Mass. 348, 351, 630 N.E.2d 265 (1994); *Commonwealth v. Scanlon,* 412 Mass. 664, 670, 592 N.E.2d 1279 (1992), citing *Commonwealth v. Bailey,* [370 Mass. 388] at 396, 348 N.E.2d 746 [1976]. A judge could, of course, exercise judicial discretion to exclude needless or repetitious details of the alleged assault, as was done in this case. See *Commonwealth v. Licata,* [412 Mass. 654]

18

> at 660, 591 N.E.2d 672 [1992], quoting *Commonwealth v. Bailey, supra* at 397, 348 N.E.2d 746.

*Commonwealth v. King*, 445 Mass. 217, 230-231, 834 N.E.2d 1175, 1189 -1190 (2005) (footnotes omitted), *cert. denied,* 546 U.S. 1216 (2006).[10]

Because the purpose of fresh complaint testimony is to corroborate the victim's testimony, it may not go beyond or "enlarge[] the scope of the facts" to which the complainant testified. *King*, 445 Mass. at 234, 834 N.E.2d at 1191.

The Petitioner first contends that at trial, without an objection or request for limiting instruction about fresh complaint evidence and how it is to be considered by the jury, the district attorney elicited from Anna that she told James Nally, Dr. Rosselot and the S.A.I.N. interviewer that Smith had sexually abused her. (TR Vol. II at 40-43)  Then on cross-examination defense counsel elicited an extensive amount of testimony from Anna about the details of her statements to others about the beatings and sexual abuse she suffered at the hands of the Petitioner. (TR at Vol. II at 62-67; 71-73; 78-79; 81-85; 88-90; 92-103; 105-106)

The Petitioner first contends that at trial, without an objection or request for limiting instruction about fresh complaint evidence and how it is to be considered by the jury, the district attorney elicited from Anna that she told James Nally, Dr. Rosselot and the S.A.I.N. interviewer that Smith had sexually abused her. (TR Vol. II at 40-43)  Then on cross-examination defense counsel elicited an extensive amount of testimony from Anna about the details of her statements to others about the beatings and sexual abuse she suffered at the hands of the Petitioner. (TR at Vol. II at 62-67; 71-73; 78-79; 81-85; 88-90; 92-103; 105-106)

Like the defendant in the *Peters* case, the Petitioner argues "that the

---

[10]     The Massachusetts fresh complaint doctrine was amended in the *King* case, but the SJC determined that the changes were only to apply prospectively. *King*, 445 Mass. at 248, 834 N.E.2d at 1201.

manner in which the fresh complaint evidence was introduced, and handled by the judge, improperly permitted the complainant to corroborate herself." *Commonwealth v. Peters*, 429 Mass. 22, 26, 705 N.E.2d 1118, 1121 (1999). Moreover, in the absence of an objection or request for a limiting instruction with regard to all of this testimony[11], Anna's statements would have been treated as substantive evidence of the truth of her complaints to others. Further, Anna's prior, out-of-court statements about the beatings were not admissible at all under the fresh complaint exception because they were unrelated to any sexual abuse. *Peters*, 429 Mass. at 27, 705 N.E.2d at 1121.

Secondly, the Petitioner complains that defense counsel elicited statements from Anna regarding fresh complaint statements she made to her mother, her aunt and her grandmother, none of whom were called as fresh complaint witnesses at trial.[12] Examples of some of this testimony is as follows:

TR. Vol II at 66
Q. And did you tell her, Dion (Anna's aunt), what you have told us here today?
A. Yes.

---

[11]

Of course it must be remembered that it was *defense counsel* who elicited all of these statements in the first place.

[12]

This evidence is included within the first objection, i.e., failure to seek a limiting instruction on Anna's testimony regarding her out-of-court statements, but is also independently objectionable for another reason, i.e., fresh complaint testimony not included in the Commonwealth's case-in-chief. (#11 at 7-8; 10-11)

TR Vol. II at 67

Q.  And you told her about Austin Smith touching you in different places?

A. Yes.

Q.  And you talked to your Aunt Dion in the spring when you were six, about doing things to your bum?

A. Yes.

Q.  And you talked to her about doing things in your mouth?

A. Yes.

Q.  And you also, did you talk to her about doing things with the belt?

A. Yes.

Q. And that would be in the spring, in April, would it not, when your mom was in the hospital?

A. Yes.

TR Vol. II at 68

Q.  And during that time [the following month when Ashley stayed with Aunt Dion again], did you have more conversation with your Aunt Dion about Austin Smith and what he did?

A. Yes.

TR Vol. II at 88

Q.  And you also told your mom and your nanny [grandmother] the other things that Austin Smith did to you?

A. Yes.

Q.  And then after school was over, you told this man Jim?

A. Yes.

TR Vol II at 89

Q.  And you also told your Aunt Dion before you talked to Jim?

A. I first told Jim, then I told my aunt, I ran out of my room crying, and then I told my aunt and the rest of the family.

Q. Did you tell Jim that day in June of 1995, did you tell him that you didn't tell anybody anything because your family was going to get killed?

21

A.  Yes.

Q.  And did you tell Jim that Austin Smith threatened to kill your mother?

A.  Yes.

Q.  And you told Jim that when Austin Smith did things to you that he always used Chapstick?

A.  Yes.

Q.  And he put the Chapstick on what you call his woo-woo?

A.  Yes.

Q.  And he also put it in his mouth?

A.  Yes.

TR Vol. II at 91

Q.  What is this?

A.  Chapstick.

Q.  Is that what Austin, Sr. would put on his woo-woo and in his mouth?

A.  No.

Q.  No.  Did you tell Jim that he used Chapstick?

A.  Yes.

TR Vol II at 92

Q.  And did you, and your mother, and your aunt, and your nanny talk about the conversation you had with Jim?

A.  Yes.

Q.  And did you, and your aunt, and your mom, and your nanny talk about the things that you have told us today that Austin Smith did?

A.  Yes.

Q.  And did you tell them at that time that Austin Smith had put his private in your bum in your mother's room?

A.  Yes.

TR Vol. II at 93

Q.  [Anna], after Jim left, did you tell your mom, and aunt, and your nanny the

things that you are telling us that Austin Smith did?

A. Yes.

Q. An did you tell them that he threatened to kill your family?

A. Yes.

*****

Q. And you told them that he would sneak into your bedroom and that he would touch your privates, isn't that correct?

TR Vol. II at 94

A. Yes.

Q. And he would do this in your mother's room on your mother's bed, is that correct?

A. Yes.

Q. And when he would do this, you would lie on the bed, on your stomach?

A. Yes.

Q. And Mr. Smith would stand up with his hands at his side and he would put his private in your bum?

A. Yes.

Q. And he would do this at the door outside your mom's bedroom?

A. Yes.

The Commonwealth had introduced no evidence with respect to Anna's purported statements to her mother, aunt or grandmother in its case-in-chief, but with the door opened by defense counsel on cross, the prosecutor elicited testimony from Anna about those statements on redirect. (TR Vol II at 107-108) Moreover, again, no limiting instruction was given with respect to any of this testimony.

23

Lastly, Petitioner contends that defense counsel "elicited an avalanche of repeated references to the complainant's out-of court allegations against Smith." (#11 at 8)  This repetitious testimony was elicited with respect to statements made to her mother, aunt and grandmother as noted hereinabove, and in defense counsel's questioning about her statements to James Nally and the S.A.I.N. interviewer as the following examples demonstrate:

TR Vol II at 83

Q. [Anna], when you talked to this person, Jim, on June 19, 1995, when you were six years old, did you tell, did you tell Jim, did you tell Jim about knowing where your private area was?

A.  I don't remember.

Q.  And when you first talked to Jim about, well do you remember talking to him about things happening to your private area?

A. Yes.

TR Vol. II at 84

Q. Do you remember, do you remember telling Jim that Austin Smith would hug you and that he would touch your privates?

A.  I don't remember.

Q.  You don't remember saying that?

A.  I don't remember saying that.

Q.  Do you remember telling Jim that Austin, Sr. put his private in your bum?

A. Yes.

Q.  Do you remember telling Jim that he would put his private in your bum and that would be during the daytime?

A.  Yes.

Q. And do you remember, do you remember telling him that this would happen

in the living room and in the kitchen area?

A. Yes.

Q. Do you remember telling him that this would happen when your mom was out on an errand or out of the house?

TR Vol. II at 85

A. Yes.

Q. Did you also tell him that this would happen in your bedroom, that he would come into your bedroom and he would put his private in your bum?

A. Yes.

Q. And do you remember telling him that your brother Austin, Jr. was in the other bed asleep when Austin, Sr. would come in to the bedroom?

A. Yes.

Q. Do you remember telling him that you would lay on your stomach on the bed?

A. Yes.

Q. And that Austin, Sr. would stand up with his hands at his side and he would put his private in your bum?

A. Yes.

*****

TR Vol. II at 96

Q. Did you tell Jim that you saw Austin Smith also put his fingers in the front privates of Jackie Elizabeth and Brianna?

A. Ah, every time my friends came over, he would ask for a hug, and –

Q. I didn't hear you, I'm sorry?

A. He would ask for a hug, and he would give them a hug, and he would do the same thing, he'd, my friends [sic] butt would be facing their private, his private part, and he would put his hands on my friend's private part, I saw.

Q. You saw that?

A. Yes.

Q. And that would be Jackie Elizabeth and Brianna?

25

A. Yes.

Q. And he also did that to you?

A. Yes.

TR Vol II at 98

Q. Is that you, that Austin Smith would tell you to get on the bed in your mother's room?

A. Yes.

Q. And when you would get on the bed in your mother's room, would you describe to me how you would be situated or how you would be lying?

A. I would be lying like it was time for me to go to bed.

Q. Okay.

A. Except, I would be, my feet would be on the ground and my stomach and the rest of my body would be on the bed, flat.

*****

TR Vol. II at 99

Q. Do you remember saying that it happened a lot?

A. Yes.

*****

TR Vol. II at 100

Q. Did you tell the person from the District Attorney's Office that your mother had been threatened to be killed or your family was threatened to be killed?

A. Yes.

Q. Did you ever tell that in the video interview?

A. Yes, I believe.

Q. Did you say in the video interview that you went into the bathroom and you spit out something yellow?

A. Yes, I did tell them.

*****

Q. Do you remember telling the people in the interview about the Chapstick?

26

A. Yes.

Q. Do you remember telling Jim about the Chapstick?

A. Yes.

Q. Do you remember ever telling Jim or the people in the interview that the Chapstick came in a container?

A. Yes.

Q. With a blue top?

A. Yes.

*****

TR Vol. II at 105

Q. And do you remember telling Jim that he rubbed his woo-woo on your butt or your rear end?

2-106

A. Yes.

Q. And do you remember telling Jim that he rubbed his woo-woo on your lips, on your mouth?

A. Yes.

The Petitioner asserts that the prejudice resulting from trial counsel's miscues, considered individually and in combination, is obvious:

> In *Lavalley* we also expressed concern that repetitive testimony from several witnesses regarding the details of the complaint may lend undue credibility to the complainant's testimony. See *Lavalley, supra* 410 Mass. at 646, 574 N.E.2d 1000 (concern that jury will treat details of complaint as substantive, rather than corroborative, evidence). See also *Cole v. State,* 83 Md.App. 279, 286, 574 A.2d 326 (1990) ("prejudice is self-evident when one party's version of an incident is allowed to be repeated again and again"). We remain

27

> concerned about this aspect of the rule. ...Because the
> evidence is corroborative, the judge may exclude
> needless repetition of the details of the fresh
> complaints. See *Lavalley, supra* 410 Mass. at 646, 574
> N.E.2d 1000. "When it appears that admission of
> details would operate unjustly-as by inciting a jury
> through a needless rehearsal of the particulars of a
> gruesome crime-the judge may well limit the testimony
> in his discretion." *Bailey, supra* 370 Mass. at 397, 348
> N.E.2d 746.

*Commonwealth v. Licata*, 412 Mass. 654, 659-660, 591 N.E.2d 672, 675
(Mass.,1992); *King*, 445 Mass. at 232 ("Judges were encouraged to restrict the
number of fresh complaint witnesses to avoid the risk of 'piling on.'"); *Lavalley*,
410 Mass. at 646, 574 N.E.2d at 1004 ("The overuse or 'piling on' of evidence
regarding the details of several fresh complaints may create the risk that the
jury will use the details of the fresh complaints as substantive evidence that the
crime actually occurred.")(footnote omitted).

The Respondent does not dispute the Petitioner's legal points with respect to the

fresh complaint evidence, but argues only that the jury had abundant evidence

upon which to convict and that the fresh complaint evidence about which Smith

complains was "simply cumulative." (#14 at 24)  That the Commonwealth

presented a quantum of evidence at trial sufficient to support the Petitioner's

convictions, while a factor to be considered, does not answer the question at

hand.  Moreover, it needs to be determined whether the fresh complaint

evidence was merely cumulative or so over the top that, combined with the

other errors, it so prejudiced the Respondent that he did not have a fair trial.

28

Prejudice has been found under different circumstances. For example, in *Williams*, 529 U.S. 362, the Supreme Court found that the defendant had a constitutionally protected right to provide mitigating evidence at sentencing and that trial counsel failed to introduce it. Counsel failed to prepare adequately for sentencing, to uncover the extensive records describing in detail the defendant's horrific childhood, to offer evidence that the defendant was mentally challenged and uneducated or to seek testimony from prison officials to say that the defendant was unlikely to act violently. *Williams*, 529 U.S. at 373-374 & nn. 4 & 5. Consequently the Supreme Court determined that the petitioner had been denied his right to effective counsel and he was entitled to habeas relief.

Counsel's failure to investigate thoroughly the defense strategy was at issue in *Dugas,* 428 F.3d 317. Given the flaws apparent in the state forensic chemist's analysis and the state's fire experts' testimony, the First Circuit noted that

> an uninformed cross-examination of the state's fire experts leads to, at minimum, serious concerns about the effect on the jury verdict of Raimo's failure to consult an expert. Put in *Strickland* terms, in a case as close as this, the likelihood of a more effective cross-examination with the use of an expert, and the effect of such cross-examination on the jurors, generates concerns that may reach "a probability sufficient to

> undermine confidence in the outcome." *Strickland,* 466
> U.S. at 694, 104 S.Ct. 2052.

*Dugas*, 428 F.3d at 341.

The most factually comparable case to the one at bar is that of *Commonwealth v. Peters*, 429 Mass. 22, 705 N.E.2d 1118 (1999).[13] His stepdaughter accused the defendant of having sexually assaulted her for six years. *Peters*, 429 Mass. at 23, 705 N.E.2d at 1119. During the jury empanelment, the trial judge had informed the jurors of the names of potential witnesses in the case, including two fresh complaint witnesses, Patricia Savelli from the Massachusetts Department of Social Services, and Marian MacLean from the Massachusetts State Police. *Peters*, 429 Mass. at 24, 705 N.E.2d at 1120. Thereafter in his opening statement, the prosecutor recited how the complainant had revealed the alleged sexual abuse to her guidance counselor at school, Mary Flemming, a person not identified by the judge as a potential witness. *Peters*, 429 Mass. at 24, 705 N.E.2d at 1120. The complainant, the first witness in the Commonwealth's case, testified in detail about the alleged abuse and about how she had told some members of her soccer team and then her

---

[13] As noted, *supra,* fn. 10, *Commonwealth v. King* has amended the fresh complaint doctrine; *King* overruled *Peters,* but *Peters* remains good law for present purposes.

guidance counselor, Ms. Flemming, about what was happening to her. *Peters*, 429 Mass. at 24-25, 705 N.E.2d at 1120.   The defense attorney interposed a general objection to the testimony and, at the conclusion of that portion of the complainant's testimony, the judge gave a limiting instruction about fresh complaint evidence.[14]

In his cross-examination the defense attorney elicited that the complainant had spoken to Ms. Savelli and the details of what were said. *Peters*, 429 Mass. at 25-26, 705 N.E.2d at 1120-1121.  On redirect the district attorney, over objection, further questioned the complainant about what she told Ms. Savelli and also had her repeat testimony about Ms. Flemming. *Peters*, 429 Mass. at 25-26, 705 N.E.2d at 1120-1121.   Neither Ms. Flemming nor Ms. Savelli were called as witnesses at trial. *Peters*, 429 Mass. at 25-26, 705 N.E.2d at 1120-1121.   Defense counsel did not seek to strike the testimony of the complainant about the details of her complaint, and both the prosecutor and the defense attorney referenced the complainant conversations with Ms. Flemming or both Ms. Flemming and Ms. Savelli. *Peters*, 429 Mass. at 26, 705 N.E.2d at

---

[14]

On appeal, the Massachusetts Supreme Judicial Court found that the fresh complaint instructions, which were repeated at the conclusion of the evidence, were "flawed in several respects." *Peters*, 429 Mass. at 32, 705 N.E.2d at 1125.

1121.

On appeal the defendant argued "that the manner in which the fresh complaint evidence was introduced, and handled by the judge, improperly permitted the complainant to corroborate herself." *Peters*, 429 Mass. at 26, 705 N.E.2d at 1121. The SJC agreed and found that a new trial was necessary. *Peters*, 429 Mass. at 26, 705 N.E.2d at 1121.

After reviewing the fresh complaint doctrine, the Court noted that

> even if a complainant has been permitted to testify to the details of a fresh complaint in a past case, the defendant may not have incurred prejudice. The testimony as to details, for example, may be cumulative or merely a reiteration of other testimony properly admitted as fresh complaint....[However] [b]ecause the fresh complaint doctrine is not operative until fresh complaint testimony from someone other than the complainant is properly introduced, the manner of self-corroboration in this case was erroneous. The complainant was permitted to testify to the details of the complaint.

*Peters*, 429 Mass. at 30-31, 705 N.E.2d at 1124.

The defendant was found to be entitled to a new trial because, *inter alia*, objections should have been made when the complainant's testimony referenced conversations with individuals not called as fresh complaint witnesses; "the

32

cross-examination of the complainant by defendant's trial counsel on her contact with Savelli was inept and introduced improper fresh complaint evidence, including details, that the Commonwealth had not offered"; "[t]here should have been a motion to strike all of the complainant's fresh complaint testimony at the conclusion of the Commonwealth's case because most of it exceeded proper limits"; and "[t]he motion to strike should have been accompanied by a request for a strong instruction to the jury to disregard the testimony." *Peters*, 429 Mass. at 31-32, 705 N.E.2d at 1124-1125.  In short, the SJC was

> satisfied as a result of his trial counsel's action, that the defendant lost an available ground of defense. A considerable amount of inadmissible fresh complaint evidence was placed before the jury under flawed jury instructions. The defendant testified. The thrust of his defense was that the complainant hated him, and that she had fabricated the charges because of her dislike for him and to explain away problems she was having. The complainant was the principal witness for the Commonwealth, and several important parts of her testimony were uncorroborated.  Where the case hinged on the issue of credibility, the deficient representation provided by the defendant's trial counsel, and what flowed from it, cast doubt on the validity of the jury's verdicts.

*Peters*, 429 Mass. at 33, 705 N.E.2d at 125 (footnote omitted).

33

The many parallels to the issues in the instant case are plain.[15]

However, there is one salient difference. The *Peters* case was not decided on a petition for a writ of habeas corpus; rather, it was a direct appeal from a criminal conviction. On a direct appeal, a Court can reverse a conviction because of errors of the trial judge. A habeas court, on the other hand, must limit its inquiry to whether the state court's application of federal law was objectively unreasonable. Indeed, even when "it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." *McCambridge,* 303 F.3d at 36.

In the instant case, the Court finds the question of prejudice resulting from trial counsel's ineptness to be a close one. It is clear that Anna's credibility was the lynchpin of the Commonwealth's case, and it is also clear that evidence which bolstered her credibility was erroneously admitted into evidence. Both the volume and the nature of the testimony improperly admitted into evidence is disturbing, especially given that all of the testimony in the case was taken on a single day, July 30, 1997. Anna was basically permitted to self-corroborate

---

15

The Court's analysis was conducted under the *Saferian* standard for ineffective assistance of counsel. *Peters*, 429 Mass. at 31 n.12, 705 N.E.2d at 1124 n.12.

over and over again in minute detail.   This piling on of inadmissible evidence that effectively underscored and buttressed Anna's testimony gives rise to concerns of unfairness.  At bottom, the Commonwealth's case was strengthened by the improper admission of this evidence, and  "*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced." *Dugas*, 428 F.3d at 335 (citation omitted).

However, having said all that, the Court cannot find that the state court unreasonably applied federal law in rejecting the argument that  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694*,* Having read the entire trial record, it is just as probable that the jury would have found Anna credible based solely on the testimony which was properly admitted.   Put another way, there is no **reasonable** probability that the erroneously admitted evidence would have altered the result.

The reason for this conclusion is that although erroneously admitted, the evidence was essentially cumulative.  Anna testified that she gave substantially the same recitation of facts to all of the people to whom she reported the abuse.

The Court might feel differently if within the evidence which was erroneously admitted, there was some important evidence necessary for conviction or which was particularly weighty in favor of conviction which was not otherwise before the jury in the form of properly admitted evidence.  But there is no such evidence.

Thus, the Appeals Court's decision was neither contrary to federal law nor did it involve an unreasonable application of federal law. Habeas corpus relief on Ground One should be denied.

## B. Ground Two - Failure to Introduce Scientific Evidence

The Petitioner argues that his attorney was ineffective for failing to introduce scientific evidence that "directly contradicted [Dr.] Rosselot's testimony." (#11 at 11-12)  The Appeals Court considered this claim and determined it to be without merit. (#7, Exh. 11)

Dr. Rosselot testified that tiny crack-like fissures inside of the anus are highly indicative of anal rape, and such an injury typically healed in twenty-four hours. (#11 at 11)  Smith's attorney did not introduce scientific testimony via a learned treatise to contradict or impeach the doctor's testimony.  This failure, the Petitioner argues, amounts to ineffective assistance of counsel.

Again, under the *Strickland* analysis, prejudice exists when there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Dugas,* 506 F.3d at 3 (quoting *Strickland,* 466 U.S. at 694).  Smith cannot satisfy *Strickland's* requirements. Even if the failure to introduce the referenced treatise constituted deficient performance, there existed no prejudice from failing to do so.[16]

---

[16]

It is noted that although the Petitioner

must prove both deficient performance and prejudice to prevail on his ineffective assistance of counsel claim, a reviewing court need not address

According to the Petitioner, prejudice exists because the treatise that was not introduced opined that "anal fissures cause 'knife-like pain with bowel movements,' and in the approximately one-half of patients who heal with conservative treatment for such fissures, healing takes about a month, not twenty-four hours." (#11 at 12)  Applying this medical opinion, if Anna had been anally raped, she *potentially* could have suffered "knife-like pain" which, in roughly 50% of patients, takes about a month to heal. (#11 at 12)  This treatise hardly speaks in terms of certainties.  The lack of absolutes or precision in medical opinion contained in the treatise could not have cast substantial doubt upon Dr. Rosselot's testimony.

---

Footnote 15 (continued)
both requirements if the evidence as to either is lacking. As the Supreme Court has recognized, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697.

*Sleeper,* -.F.3d-, 2007 WL 4248494, at *5.

Although the Court has found no prejudice with respect to Ground Two, this is not to suggest that there is evidence of deficient performance with respect to the issue by counsel at trial.  To the contrary, as the Respondent notes in his brief, the record indicates that Smith's trial counsel was prepared to cross-examine Dr. Rosselot in that counsel successfully sought funds to engage the services of an expert, he twice sought continuances of the trial to consult with experts on the topic of anal rape, and he represented that he had consulted with a gynecologist at Massachusetts General Hospital. (#14 at 25)

An attorney's performance must be judged upon the choices available at trial when his tactical choices were made and implemented. *See United States v. Natanel,* 938 F.2d 302, 309 (1 Cir., 1991), *cert. denied,* 502 U.S. 1079 (1992).  The tactical decision not to introduce this treatise did not fall below the reasonable standard so as to deprive Smith of effective assistance of counsel.

Moreover, even if the treatise was definitive in its evaluation of healing time so as to challenge directly Dr. Rosselot's testimony, as applied to the facts in this case it would have no prejudicial effect. This is because more than a month had passed since the last possible interaction between the victim and the Petitioner and Anna's examination by Dr. Rosselot. (#13 at 26) As a result, even according to the treatise, Anna could have been healed by the time she was seen by the doctor. In these circumstance, introduction of the treatise would not have contradicted or otherwise impeached Dr. Rosselot's testimony.

The Appeals Court's determination that this claim of error was insubstantial is not objectively unreasonable. (#7, Exh. 11) Therefore, Smith's claim of ineffective assistance of counsel for failure to introduce scientific evidence must fail.

## C. Ground Three - Failure to Call the Victim's Mother as a Witness

Smith next argues that his attorney was ineffective for failing to call the victim's mother, Miriam, to testify. Calling a particular witness at trial can be fraught with peril. Indeed,

> Sound trial strategy counsels against calling a witness
> who is likely to be hostile, and who will therefore not
> offer testimony helpful to the defense. As every

> litigator knows, "[t]he decision whether to call a
> particular witness is almost always strategic, requiring
> a balancing of the benefits and risks of the anticipated
> testimony. The witness may not testify as anticipated,
> or the witness's demeanor or character may impress
> the jury unfavorably and taint the jury's perceptions of
> the accused." *Lema v. United States,* 987 F.2d 48, 54
> (1st Cir.1993) (internal citations omitted).

*U.S. v. Merlino*, - F. Supp.2d -, 2007 WL 4146307, at *5 (D. Mass.,

11/21/2007)(footnote omitted).

Had his defense attorney called Miriam to testify, the Petitioner contends

that "she might have revealed what she told Smith's attorney's private

investigator - that Anna had told her that she fabricated the charges against

Smith." (#11 at 13)  The argument runs that such exculpatory evidence might

have factored into the jury's deliberations.  However, in advancing the

argument as to why Miriam should have been called to testify, Smith details

many of the reasons why a reasonable attorney would *not* have called her.

First, it seems self-evident that the mother of an alleged sexually abused

child would harbor hostility towards the alleged abuser and so would be

unlikely to provide testimony favorable to the abuser's cause.  Second, Smith

states that Miriam initiated domestic violence proceedings against him for

reasons related to an IRS refund check. (#11 at 12)  Third, Smith describes a

"pattern of animosity" between himself and Miriam and her family, claiming that Miriam and/or her relatives manipulated the victim into fabricating charges against him. (#11 at 13)

What the nature of Miriam's testimony would have been is speculative at best since there is no sworn affidavit in the record detailing the particulars of her purported testimony. (#14 at 27, n.14)  That point aside, if admissible, testimony that the victim told her mother that her claims of abuse were made up could certainly have been persuasive evidence for the Petitioner. Nevertheless, choosing not to present the jury with a potentially hostile witness who had been embroiled in a pattern of animosity towards the defendant (and not knowing with certainty what she would say on the witness stand) was quite clearly a tactical decision that does not constitute *Strickland* error. *See U.S. v. Porter,* 924 F. 2d 395, 397 (1 Cir., 1991) (attorney's decision not to call exculpatory witness for fear witness may in fact identify defendant as robber was well within "the scope of informed professional judgment").  The Appeals Court's determination that this claim of error was insubstantial was not objectively unreasonable. (#7, Exh. 11)[17]  The claim that counsel was

---

[17]

The Appeals Court noted that this claim was suspect given that "assertions of a recantation by the victim...were brought to the court's attention only after the victim had died."  (#7, Exh. 11)

ineffective for failing to call the victim's mother as a witness must fail.

### D. Ground Four - Grand Jury Proceedings

The Petitioner claims his attorney was ineffective for failing to challenge information given to the grand jury regarding whether Smith lived with the victim. (#11 at 14-15)  Trial counsel filed a motion to dismiss alleging that during the grand jury proceedings, "the Commonwealth impaired the grand jury's integrity to indict by presenting distorted and prejudicial evidence." (#7, Exh. 2)  What defense counsel did not call to the court's attention was the fact that the Petitioner had been incarcerated during part of the time covered by the indictments. (#7, Exh. 2; #11 at 14)

Specifically, during the proceedings a grand juror asked if Smith lived with the victim and the witness responded that, "Yes. He was living there. Yes." without reference to a time frame. (#13 at 29-30)  The incidents described in the indictments occurred between December, 1993 and May, 1995.  Since Smith was incarcerated from December, 1993 to May, 1994, he would not have been living with the victim for the first five months of the allegations.

Petitioner argues that the prosecutor, as a representative of the Commonwealth, should be held responsible to correct false or misleading

information presented to the grand jury. (#11 at 15)  In the Petitioner's view,
the prosecutor's failure to clarify the question and answer rose to the level of
impairing the integrity of the grand jury by purposely misleading them with the
witness' vague answer. (#11 at 15)

The Supreme Court has

> provided the applicable standard for determining when
> errors before the grand jury warrant dismissal of an
> indictment: "[A]s a general matter, a district court may
> not dismiss an indictment for errors in grand jury
> proceedings unless such errors prejudiced the
> defendants."  As we explained in *United States v.*
> *Valencia-Lucena*, 925 F.2d 506, 511 (1st Cir 1991),
> errors before the grand jury will often be deemed
> harmless if the defendants were subsequently and
> properly convicted before an impartial petit jury.

*United States v. Flores-Rivera*, 56 F. 3d 319, 328 (1 Cir., 1995) quoting *Bank of*
*Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)(additional citations
omitted).

The Petitioner contends that the prosecutor purposely and knowingly provided
false information to the jury by failing to clarify the witness' answer.  Had trial
counsel made the court aware of the prosecutor's alleged error, Smith argues,
"it might well have reached a different result in ruling on the motion to
dismiss." (#11 at 15)

The witness' answer, while vague, accurately answered the grand juror's inquiry.  Any failure by the prosecutor to provide further clarification falls outside of the realm of clear misconduct. *See United States v. Casas,* 425 F.3d 23, 38 (1 Cir., 2005), *cert. denied*, 547 U.S. 1061 (2006).  "Absent evidence of 'prosecutorial misconduct that actually biases the grand jury in performing its fact-finding function,'" error will not be found. *Casas*, 425 F.3d at 38 quoting *United States v. Maceo*, 873 F.2d 1,3 (1 Cir.), *cert. denied*, 493 U.S. 840 (1989). This incident did not provide a legal basis to challenge the grand jury proceedings, *Flores-Rivera*, 56 F. 3d at 328, and failure to include this information in his motion to dismiss does not constitute ineffective assistance of counsel. *See Strickland,* 466 U.S. at 688 (holding that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms").

**E.  Ground Five - Failure To Obtain And Present Evidence At Trial**

The Respondent's argument with respect to Ground Five, i.e., procedural default, is distinct.  Moreover, since Smith advances no argument in his memorandum of law to support Ground Five, the relevant issues may be discussed with some dispatch.

The law is clear that federal courts cannot review state court decisions that are based on "'independent and adequate state ground[s].'" *Simpson v. Matesanz*, 175 F.3d. 200, 205-206 (1 Cir., 1999) quoting *Trest v. Cain*, 522 U.S. 87 (1997), *cert. denied,* 528 U.S. 1082 (2000); *Torres v. Dubois*, 174 F.3d 43, 45-46 (1 Cir.), *cert. denied sub nom. Torres v. Maloney,* 528 U.S. 898 1999). More specifically, federal courts "are barred from reviewing federal questions" in habeas petitions from state prisoners "which the state court declined to hear because the prisoner failed to meet a state procedural requirement." *Brewer v. Marshall*, 119 F.3d 993, 999 (1 Cir., 1997) citing *Lambrix v. Singletary,* 520 U.S. 518 (1997), *cert. denied,* 522 U.S. 1151 (1998).  Such a state court judgment is found to rest on independent and adequate state procedural grounds. *Coleman v. Thompson,* 501 U.S. 722, 729 (1991); *Brewer*, 119 F.3d at 999.

In this case, because Smith failed to raise his Ground Five claim regarding

the videotape either on direct appeal or in his first motion for new trial, the Appeals Court deemed the claim to have been waived. (#9, Exh. 22)  As a consequence, review of this claim in the habeas setting is precluded. *See Boutwell v. Bissonnette,* 66 F. Supp.2d 243, 245 (D. Mass., 1999)(petitioners' claims rejected as waived for failure to assert them in the original state appeal).[18]

## VI. Conclusion and Recommendation

For all the reasons stated, I RECOMMEND that the Petition for Writ of Habeas Corpus be DENIED as to all grounds stated in the Petition and that Judgment enter DISMISSING the Petition.

## VI.  Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's

---

[18]

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto', or demonstrate that the failure to consider the federal claim will result in a '"fundamental miscarriage of justice"'". *Coleman,* 501 U.S. at 749-50 quoting *Murray v. Carrier,* 477 U.S. 478, 485 (1986)(further citations omitted).  Since Smith has made no such argument or showings in this case, no further discussion is warranted.

receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.  *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

January 29, 2008.